## ESTATE OF ANGELIA R. SCOTT, DECEASED.

[No. 19,473; decided August 29, 1898.]

**Insanity of Testator—Evidence and Burden of Proof.**—The legal presumption is in favor of the sanity of a testator, and the burden of proof is on the contestant of his will to demonstrate the contrary; and if the contestant prevails, in a case of doubt, it must be by a preponderance of proof, and the number, character and intelligence of witnesses, and their opportunity for observation, should be taken into account.

**Witnesses—Credibility as Affected by Station in Life.**—Persons employed in domestic service and other categories of honest labor are entitled, as witnesses, to credence equally with those who plume themselves on their higher level, affecting to look down on those who work for wages as inferior. Before the law there is no such distinction, and in courts of justice all must be co-ordinated, irrespective of the accidents of artificial and conventional social relations.

**Witnesses—Manner of Testing Credibility.**—Each witness is a man or woman to be treated as an individual, a moral unit, tested for integrity and veracity on his merits or her title to credit by the inherent and extrinsic elements of belief, or the circumstantial criteria of credibility. These are the only considerations for the court in weighing evidence.

**Insane Delusions—Business Capacity.**—Business capacity may co-exist with monomania or insane delusions.

**Insane Delusions—Vulgarity of Testatrix.**—Where the vulgarity in behavior and speech of a testatrix is relied upon to establish the presence of insane delusions, her whole conduct, at home and aboard, should be considered, and not merely her conduct within her own house, the alleged acts of immodesty in this case being confined to the home premises of the testatrix, while her behavior abroad was not subject to adverse criticism.

**Insane Delusions—Eccentricities not Suddenly Acquired.**—Eccentric habits of speech, if not suddenly acquired, are not evidence of insanity.

**Expert Evidence—Its Nature and Value.**—Expert evidence is really an argument of the expert to the court, and is valuable only with regard to the proof of the facts and the validity of the reasons advanced for the conclusions.

**Insane Delusions—Suspicions as to Husband's Constancy.**—Where there was at least one instance in the conduct of a husband which might arouse in the mind of the wife a suspicion as to his constancy, the fact that her suspicions may have been unjust and her

inferences too general, is merely an error of logic, and not an evidence of insanity or of an insane delusion. She has a right to infer, however erroneously, or from inadequate premises, to a universal conclusion.

**Insanity—Faulty Logic.**—False logic or faulty ratiocination is far from the manifestation of insanity, so long as the process is formally correct, not incoherent or inconsequential.

**Insane Delusions—Fear of Poisoning.**—A fear of poisoning on the part of a testatrix, even though a delusion, must, in order to invalidate her testamentary act, be continuous, persistent, and operative upon her volitional capacity.

**Insane Delusions—Fear of Poisoning.**—The mistaken belief of a testatrix, when suffering with chronic stomach trouble, that her food has been tampered with, does not, as a matter of law, amount to an insane delusion.

**Insanity—Unreasonable Suspicions.**—Unfounded and unreasonable suspicions are not insanity.

**Insanity—Insomnia.**—The mind of a testatrix is not necessarily diseased because she is at times troubled with insomnia while afflicted with an intestinal ailment.

**Insane Delusions—Unfounded Suspicions.**—The sanity of the testatrix in this case being questioned because she suspected that her husband was unfaithful to her, and that he was attempting to poison her and to send her to an insane asylum, the court observed: There is a very large class of people whose sanity is undoubted, who are unduly jealous or suspicious of others, and especially of those closely connected with them, and who upon the most trivial, even whimsical, grounds wrongfully impute the worst motives and conduct to those in whom they ought to confide. This insanity, which is developed in a great variety of forms, is altogether too common, and too many persons confessedly sane are to a greater or less degree afflicted with it, to justify us in saying that because the deceased was so afflicted she was insane, or the victim of an insane delusion.

**Insane Delusions—Suspicions—Evidence and Burden of Proof.**—The line between unfounded and unreasonable suspicions of a sane mind and insane delusions is sometimes quite indistinct and difficult to define. However, the legal presumption is in favor of sanity, and on the issue of sanity or insanity the burden is upon him who asserts insanity to prove it. Hence, in a doubtful case, unless there appears a preponderance of proof of mental unsoundness, the issue should be found the other way.

**Insane Delusions—Suspicions—Tests of Insanity.**—Suspicion is the imagination of the existence of something, especially something wrong, without proof, or with but slight proof; it is an impression in the mind which has not resulted in a conviction. It is synonymous

with doubt, distrust, or mistrust—the mind is in an unsettled condition. Suspicion existing, slight evidence might produce a rational conviction or conclusion; this without evidence, however slight, would be a delusion. Is there evidence, however slight? This is the test. The suspicion may be illogical or preposterous, but it is not, therefore, evidence of insanity.

**Insane Delusions—Suspicions as to Husband's Constancy.**—If a wife has evidence, though slight, on which to base a suspicion of her husband's unfaithfulness, and has no settled conviction on the subject, her suspicion does not amount to an insane delusion.

**Insane Delusion—Conspiracy to Confine Wife in Asylum.**—The contention in this case that the testatrix was afflicted with an insane delusion in that she believed her husband conspired to confine her in an insane asylum, was found by the court to be unsupported by the evidence, especially in view of the fact that the husband had twitted her of being crazy and threatened to break her will.

**Insane Delusions—Testimony of Business Men.**—The value of the testimony of business men and acquaintances, acquired in commercial dealings with a person alleged to be the victim of insane delusions, is favorably regarded by the courts, on the issue of insanity.

**Testamentary Capacity—Inquisition Before Execution of Will.**—The examination by medical experts of a testatrix prior to her execution of her will, for the purpose of determining her testamentary capacity, is discussed by the court, both as a suggestion of insanity, and as a wise precaution.

**Testamentary Capacity—Will as Evidence.**—A will may be considered in proof of its own validity and of the sanity of its maker.

**Testamentary Capacity—Suspicion of Husband.**—If there are causes sufficient to induce a sane woman to ignore her husband in her will, or reduce what otherwise would have been a just allowance, the fact that she entertains an unjust or an unfounded suspicion in regard to his treatment of her, or an unjust prejudice against him, does not affect the will nor demonstrate that she is necessarily of unsound mind.

**Testamentary Capacity—Test for Determining.**—The tests of testamentary capacity are: (1) Understanding of what the testatrix is doing; (2) how she is doing it; (3) knowledge of her property; (4) how she wishes to dispose of it; (5) and who are entitled to her bounty.

**Testamentary Capacity—Testimony of Attesting Witnesses.**—The testimony of the attesting witnesses, and, next to them, the testimony of those present at the execution of the will, are most to be relied upon in determining the question of testamentary capacity.

**Testamentary Capacity—Insane Delusions.**—In this case the husband of the testatrix contests her will on the ground that she was

of unsound mind by reason of being the victim of insane delusions that her husband was unfaithful, that he was trying to poison her, and that he was conspiring to confine her in an insane asylum, but the court finds against the contestant and sustains the will.

Morris M. Estee, A. Everett Ball, and Charles A. Shurtleff, for contestant, Emerson W. Scott.

A. E. Bolton, C. S. Peery, J. H. Henderson, J. B. Gartland, R. E. Houghton, P. G. Galpin, H. M. Owens, and Guy C. Earl, for proponents and respondents.

E. D. Sawyer, for persons otherwise unrepresented.

COFFEY, J.   This is a contest instituted by E. W. Scott to the probate of certain papers filed herein on December 22, 1897, purporting to be the last will and codicils of Angelia R. Scott, deceased, the proponents being the executors named therein, C. S. Tilton, Frank Garcia, Junior, and C. M. Gerrish, who simultaneously present a petition for admission to probate and the issue of letters testamentary to them thereon and thereunder.

The petition for probate sets forth that decedent died on December 16, 1897, in San Francisco, of which city and county she was a resident and left estate therein and also in the counties of Santa Clara and Tulare, consisting of real and personal property not exceeding $450,000 in aggregate value, all of which was her separate estate; that she left a will and codicils, copies of which are hereinafter inserted in this opinion; that the petitioners named as executors consent to act; the names of the devisees and next of kin are given; and it is alleged that decedent had no other devisees or heirs at law; it is further alleged that decedent left a husband, E. W. Scott, but no children, and that her father and mother had predeceased her; it is finally alleged, in proper phrase and form, that she was of sound mind at the time of executing the papers propounded and that in all respects and circumstances her testamentary acts were free from legal fault or blemish, and, therefore, should be consummated through the court.

The will and codicils are as follows:

"IN THE NAME OF GOD, AMEN. I, Angelia R. Scott, of the City and County of San Francisco, State of California, being of sound and disposing mind and memory, do make, publish and declare this my last will and testament.

"I. I give, devise and bequeath to the officers of Apollo Lodge of the Independent Order of Odd Fellows in the City and County of San Francisco, and their successors in office, the sum of Two Thousand (2,000) Dollars, to be by them invested and the proceeds thereof to be used in the preservation and care of the cemetery lots in the Odd Fellows Cemetery in the City and County of San Francisco, in which my late husband, Salvin P. Collins, and my nephew, John Quincy Wormell, are buried.

"II. I give, devise, and bequeath to Horatio Stebbins the sum of Three Thousand (3,000) Dollars, to be used by him at his discretion to advance the interests of the First Unitarian Church in this City and County.

"III. I give, devise, and bequeath to Carl Anderson, my coachman, who has served me faithfully for five years, Five Hundred (500) Dollars.

"IV. I give, devise, and bequeath my diamond earrings, one bar pin with one diamond, one finger ring set with three large diamonds, my chain and charms to my niece, Helen Garish, and my watch to my niece, Ella Perkins.

"V. I give, devise, and bequeath my cluster diamond ring and one small solitaire diamond finger ring, the gift of my late husband, S. P. Collins, to his sister, Mrs. Rachel Johonnot.

"VI. I give, devise, and bequeath one diamond solitaire finger ring to Mrs. Frank Garcia, wife of my nephew, Frank Garcia.

"VII. I give, devise, and bequeath all the rest and residue of my property as follows: One fiftieth thereof to each of the following persons, children of my late brother, Amos P. Wormell, namely: One-fiftieth to Andrew Wormell of Dover, New Hampshire: one-fiftieth to Charles Wormell, of Sunbury, Ohio; one-fiftieth to William Wormell of the same place; one fiftieth to Eugene Wormell of Livermore, Maine; one-fiftieth to Lettie Wormell of Colorado; one-fiftieth to Salvin Ulysses Wormell of Phillips, Maine;

two-fiftieths thereof to Louisa E. Roe, daughter of my late brother, Amos P. Wormell, of Island Pond, Vermont; six-fiftieths thereof to my sister Mary A. Cowan and her daughter Amanda Meily, share and share alike; six-fiftieths thereof to M. S. Chamberlain, nephew of my ·late husband, S. P. Collins, now residing at Concord, New Hampshire; one-fiftieth thereof to Mrs. Rachel Johonnot, sister of my late husband, residing at Montpelier, Vermont; one-fiftieth thereof to Florence Swall, wife of George Swall of Mountain View, California, niece of S. P. Collins, deceased; one-fiftieth thereof to Eugene Wormell, son of my brother Nathaniel Wormell, now residing at Seattle, Washington; one-eighth to my nephew Frank Garcia; one-eighth to my niece Helen Gerrish, wife of Charles Gerrish of Port Townsend, Washington; one-eighth thereof to Mrs. Ella Perkins, of Santa Clara County, California, wife of Caleb F. Perkins; one-tenth thereof to Mrs. Louisa Garcia, my sister; one fortieth thereof to Chester and Nellie Swall, son and daughter of George and Florence Swall of Mountain View, California, share and share alike, two-fiftieths thereof to my husband, E. W. Scott.

"In case any of my legatees contest the probate of this will, I, hereby revoke the legacy of such contestant, and direct that such legacy become a part of my estate.

"VIII.  I nominate and appoint Charles S. Tilton, Caleb F. Perkins, and Frank Garcia, Jr., as executors of this my last Will and Testament without bonds.

"In Testimony Whereof, I have made, published and declared the foregoing as my last Will and Testament.
                    "ANGELIA R. SCOTT. (Seal.)

"Signed, sealed, published and declared to be her last Will and Testament by the aforesaid Angelia R. Scott, in our presence, who in her presence and in the presence of each of us, and at her request have hereto set our hands and seals, as witness this seventh day of November, A. D. 1891.
          "JACOB C. JOHNSON, 1519 Van Ness Ave.
          "EDWARD H. HORTON, 30 Post Street.

"Whereas, I Angelia R. Scott, by my will subscribed on the 7th day of November, 1891, appointed Caleb F. Perkins

together with Charles S. Tilton and Frank Garcia, Jr., to be executors of my last Will and Testament.

"Now, then, I hereby revoke the nomination and appointment of said Perkins as one of my said executors, and it is my desire that this Codicil be annexed to and made a part of my last Will and Testament as aforesaid to all intents and purposes.                    ANGELIA R. SCOTT.

"Signed, sealed, published and declared to be and as and for a codicil to her last Will and Testament by Angelia R. Scott, in our presence, who in her presence, and in the presence of each of us and at her request have hereto set our hand and seals as witnesses this 25th day of February, A. D. 1892.                    J. C. JOHNSON.
                                   "E. H. HORTON.

"Whereas, I, Angelia R. Scott, of the City and County of San Francisco, have made my last Will and Testament in writing, bearing date the seventh day of November, in the year of our Lord, one thousand, eight hundred and ninety-one, and in and by which I give and bequeath to my sister, Mary A. Cowan and her daughter, Amanda Meily, six-fiftieths of the residue of my estate (after providing for certain legacies) to be divided share and share alike between them, and whereas, since then said Mary A. Cowan has died, and I desire to revoke so much of said Will as devises six-fiftieths to her and her daughter Amanda Meily.

"And Whereas, by the same instrument, I have devised one-fiftieth of said residue to Florence Swall, wife of George Swall of Mountain View, and since that time said Florence has died, leaving three children; and whereas I also devised to Eugene Wormell, son of my brother, Nathaniel Wormell. residing at Seattle, Washington, one-fiftieth part of said residue, and since then he has died, and whereas, I also desire to change the devise to Frank Garcia, of one-eighth of my estate, and to decrease the amount thereof and whereas I did devise one-eighth of my said estate to Helen Garish. wife of Charles Garish; and I desire to increase the amount devised to her; and whereas, I did devise one-eighth of the residue of my said estate to my niece Ella Perkins, I now desire to devise something to her four children; and whereas, I

now desire to make a bequest to the Old People's Home of San Francisco, and to the three children of my present husband, E. W. Scott; and whereas, I desire to revoke the gift of two thousand dollars to the Apollo Lodge of the Independent Order of Odd Fellows, and desiring to preserve the general features of my former will making new distributions when necessary by deaths which have happened since the making of that will, I prefer to do this by way of another codicil to my former Will instead of executing a new Will; but in any respect in which this codicil shall conflict with the provisions of my former Will, I fully intend that this codicil shall control the provisions of the former Will and that otherwise the former Will and the codicil thereof shall stand unaffected by it.

"I revoke the bequest I made in my said Will of Two Thousand Dollars to the Apollo Lodge of the Independent Order of Odd Fellows, and I give, devise and bequeath Two Thousand Dollars to the Apollo Lodge of the Independent Order of Odd Fellows in the City and County of San Francisco, and I request them to take care of my cemetery lot in the Odd Fellows Cemetery in this city and County of San Francisco.

"I give, devise and bequeath the sum of One Dollar to each of the following persons: To Mrs. Amanda Miley, daughter of Mary A. Cowan; to Mrs. Nellie Swall, wife of George Swall; to Mrs. Eliza Paisley, wife of Donald Paisley, sister of my late husband.

"I give, devise and bequeath to my maid, Estella Burnham, Five Hundred Dollars if she is in my employment down to the time of my decease.

"I give, devise and bequeath my emerald finger ring set with diamonds, and also my large solitaire diamond finger ring to Mrs. Helen Garish.

"I give, devise and bequeath all the rest and residue of my estate subject to all unrevoked legacies and bequests of my Will, and subject to those herein contained as follows:

"Of such residue, two-fiftieths thereof to my nephew, Andrew Wormell of Dover, New Hampshire.

"Two-fiftieths thereof to Charles Wormell, of Sunbury, Ohio.

"Two-fiftieths thereof to my nephew, William Wormell of the same place.

"Two-fiftieths thereof to my nephew, Salvin Ulysses Wormell, of Phillips, Maine.

"Three-fiftieths thereof to my niece, Louisa E. Roe, of Island Pond, Vermont, daughter of my brother, Amos P. Wormell.

"One-fiftieth thereof to Lulu Wormell, of Oakland, daughter of my nephew Eugene Wormell, now deceased.

"Six-fiftieths thereof to Mortimer S. Chamberlain, residing at Concord, New Hampshire, nephew of my late husband, S. P. Collins.

"Three-fiftieths thereof to Mrs. Rachael Johonnet, sister of my late husband, S. P. Collins.

"Three-fiftieths thereof to Ella Perkins, of Santa Clara County, wife of C. F. Perkins.

"Three-fiftieths thereof to be divided share and share alike between the four children of said Ella Perkins, or the survivors of them at my decease.

"Seven-fiftieths thereof to Helen Garish, my niece, wife of Charles Garish of Port Townsend, Washington.

"Four-fiftieths thereof to my sister, Mrs. Garcia, wife of Frank Garcia, (senior).

"Three-fiftieths thereof to be divided share and share alike between the children, now living or the survivor of them, at my death, of Florence Swall, and George Swall, of Mountain View, California, said Florence Swall being a niece of my late husband, S. P. Collins.

"Four-fiftieths thereof to Frank Garcia, Jr. son of Frank Garcia.

"Two-fiftieths thereof to my husband, E. W. Scott.

"One fiftieth thereof to Lloyd N. Scott, for himself, for his brother, Wesley B. Scott, and his sister, Laura May Scott, share and share alike; but he is to receive and hold in trust the shares of Wesley B. Scott and Laura B. Scott, invest the same, and use the income or principal, if necessary, for their education and support until both beneficiaries shall die or become of age; and in case of death of either beneficiary the share of such decedent shall be divided equally between the survivors, unless decedent leaves

issue him or her surviving, and in that event the share of said decedent shall go to said issue.

"One-fiftieth thereof to the Old People's Home of San Francisco.

"One-fiftieth thereof to the San Francisco Protestant Orphan Asylum.

"And in case any of my devisees or legatees shall contest the probate of this Will the bequest or devise to them is hereby revoked, and the amount bequeathed or divised to such contestant shall go back and become a part of my estate, and be divided pro rata among the residuary devisees.

"I also nominate and appoint Charles Garish to be another executor of my estate.

"I also revoke the bequest of my one large solitaire diamond finger ring to Mrs. Frank Garcia, formerly wife of, Frank Garcia, Jr., and I give, devise and bequeath the same to Helen Garish.

"(Seal)    ANGELIA R. SCOTT.

"Signed, sealed and published and declared to be and as for a codicil to her last Will and Testament by Angelia R. Scott in our presence, who in her presence and in the presence, of each of us and at her request, have hereto set our hands and seals as witnesses this 22nd day of October, A. D. 1897.

"JACOB C. JOHNSON, 1519 Van Ness Ave.<br>
"EDWARD H. HORTON, 2110 Devisadero St.<br>
"PHILIP G. GALPIN, 1738 Broadway."

The contestant alleges that he is the surviving husband of deceased, of the age of sixty-one years, and as such survivor is an heir at law of said deceased and interested in the estate, and is a legatee under the instrument propounded to the extent of two-fiftieths of said estate. He denies each and all the matters set forth in the petition for probate except the death, age and the residence of decedent. He then sets up two grounds of opposition and contest: (1) Unsoundness of mind; (2) Undue influence exercised by Louisa Garcia, a sister, Helen Gerrish, a niece, and Frank Garcia, a nephew of said decedent, the undue influence consisting in falsely representing to decedent that her husband was un-

true to her for the purpose of misleading, deceiving, and prejudicing her against him and controlling her in making her Will and inducing her to neglect to provide suitably for him, the natural object of her bounty, and that such false representations had the purposed effect. The contestant further alleges that at the time of the alleged testamentary acts the testatrix was laboring under certain insane delusions, (a) that her husband was untrue to her, (b) that he was trying to poison her, and (c) that he was engaged in a conspiracy with others to commit her to an insane asylum, and that the said Louisa Garcia, Helen Gerrish, and Frank Garcia in furtherance of their purpose fostered and encouraged these insane delusions. All of these allegations are traversed in due form by proponents and respondents.

Contestant claims a right to institute and prosecute a contest under section 1307, Code of Civil Procedure, as a person interested, as one who would take under the statute of succession if decedent had died intestate.

Issue having been joined, this contest came on for trial before the court, a jury being waived, on Tuesday, the twenty-second day of March, 1898, and continued with intermissions until Thursday, the nineteenth day of May, 1898, when after ample argument extending over four days, the issues were submitted for deliberation and decision.

The entire time of trial, including the taking of testimony and the audition of argument, was eighty-one hours and forty-five minutes; divided as follows:

Examination of witnesses: Sixty-six hours.

Arguments of counsel: Fifteen hours and forty-five minutes.

There were forty-two witnesses for contestants, thirty-six for respondents, seventy-eight in all.

These minutiae are material only as intimating the importance imputed to the issues by counsel and their clients and suggesting the magnitude of the interests involved employing the energies and abilities of lawyers of experience and eminence, whose intellectual resources and professional skill seemed to be taxed to the utmost in honorable endeavor to achieve success for what each in good faith from his point of view conceived to be the right.

It may be that, in these cases, the right might be developed and determined in a shorter space, but those whose fortunes are at stake in such a struggle and who bear the brunt of its expense of time and treasure are more immediately concerned in the calculation of cost than the critics to whom the result is indifferent, except that it affords a theme for censorious comment upon the tedious process of eliciting evidence and the unrestricted scope accorded to advocates in their examinations and arguments. Reform in this particular may be necessary, but it must not be so sharp or sudden as to collide with justice to individual suitors who demand thoroughness of treatment.

The issues raised by the pleadings are reduced in proof, as stated by counsel for contestant in final argument, to the following:

That the testatrix was of unsound mind by reason of certain delusions, to wit: 1. That her husband was unfaithful; 2. That he was trying to poison her; 3. That he was conspiring to confine her in an insane asylum.

If it has been established that any one of these delusions infected her mind and operated upon the testamentary act, the will should be set aside.

Added to these delusions were certain peculiarities which served to aggravate the cardinal crotchets of her cerebral constitution, to magnify her malady, and to intensify her insanity, which are thus summed up by counsel in his closing condensation of the case: (a) She was profane and vulgar in her language; (b) She danced perfectly nude before mirrors; (c) She imagined that she saw visions; (d) She heard noises in the hall at night; (e) She asked many of her associates if they thought she was insane; (f) She thus evidenced her own belief that she was insane; (g) She sought to be examined by experts before she made her will; (h) She was inordinately suspicious; (i) She was troubled with insomnia; and (j) She was insanely jealous;—all of which symptoms indicate a mind diseased.

The pith of contestant's contention may be stated in his counsel's words: That the testamentary acts were the product of a mind diseased by delusion caused by morbid jealousy.

This, then, is what we have to consider in this case: Is it established by the evidence that the mind of decedent was so far diseased by delusion on the dates of the documents in dispute as to destroy her testamentary capacity? The dates to which this question is addressed are: November 7, 1891, date of the original will; February 25, 1892, date of the first codicil; October 22, 1897, date of the second and final codicil.

The legal presumption is in favor of sanity, and therefore, as is conceded by contestant, the burden of proof is upon him to demonstrate the contrary, he occupies the affirmative of the issue in this case, and it is incumbent upon him to establish the proposition that the testatrix was of unsound mind by reason of certain delusions, and he claims to have discharged this obligation by abundant evidence of numerous witnesses.

If contestant prevail, in case of doubt, it must be by a preponderance of proof; and the number, character, and intelligence of witnesses, and their opportunity for observation, should be taken into the account: Will of Cole, 49 Wis. 181, 5 N. W. 346; Lee v. Lee, 4 McCord (S. C.), 183, 17 Am. Dec. 722.

Criticism was made upon some of the witnesses because they were assumed to be subordinate socially to others supposed to belong to a superior caste, but we have no such Hindoo scale in our American tribunals, and persons employed in domestic service and other categories of honest labor are entitled to credence equally with those who plume themselves on their higher level affecting to look down on those who work for wages as inferior; but before the law, human and divine, there is no such distinction, and in courts of justice all must be co-ordinated irrespective of the accidents of artificial and conventional social relations.

Each witness is a man or woman to be treated as an individual, a moral unit, tested for integrity and veracity on his merits or her title to credit by the inherent and intrinsic elements of belief, or the circumstantial criteria of credibility. These are the only considerations for the court in weighing evidence.

It is claimed by counsel for contestant that at the time of the date of the original will, November 7, 1891, testatrix was laboring under well-defined delusions, in relation to her husband and affecting her testamentary capacity. These delusions had their origin prior to that date, as is sought to be shown by the testimony of witnesses for contestant, and covered the years 1889, 1890, and 1891, forming a complete chain showing their continuation and persistence; they had their inception in unjust and unfounded suspicions and grew to such an extent and proportion as to render her irrational and insane, a victim of insane delusion, which, as said by the expert witness Dr. F. W. Hatch, often arises from misinterpreted suspicions, the gradual building up of which finally results in a fixed delusion, a condition that is not amenable to argument nor mutable by reason; and it is further claimed by counsel that the proof for proponents supports the theory of contestant as to the existence and effect of these delusions and is, in the main, corroborative of his contention.

Angelia R. Scott died on December 16, 1897, rising sixty-five years of age, having been born July 14, 1833, in Strongville, Maine; she was over fifty-eight years when she made the original will, over fifty-nine years when she made the first codicil, and over sixty-four years when the final paper was executed, October 22, 1897. She was the widow of Salvin P. Collins, when on March 6, 1889, at the age of fifty-five years, she married Emerson W. Scott, a widower, fifty-two years old, several years her junior. Each had passed the period of probation in the spousal relation; they were no longer young; both were mature and experienced in married life, with knowledge of the weakness as well as the worth of the opposite sex, with no general illusions of the perfectness of the individual man or woman; what faults they had were carefully concealed, and each was concerned to appear to best advantage in the presence of the other, as persons seeking each other's society in the way of sparking usually exhibit only the favorable aspects of their character, and are adroit in avoiding the exposure of the shady and the seamy sides of selfishness and coarseness in the grain of the garb of human

nature; such is life in love previous to marriage which is, as we are advised by one of the counsel, "a leap in the dark," which young men and maidens should not venture upon too rashly, but these parties had each survived their first venture and hesitated not to embark upon another. She had been well reared, her parents were persons of respectability and refinement and afforded her the means and opportunity of education suited to her situation and sex; she had come to California at an early date, in the primitive and pioneer period of American settlement and domination, and had married her first husband, Mr. Collins, a well-known restaurateur and wine merchant, who founded an establishment which still bears his name and continues flourishing and perpetuating the goodwill and good cheer that brought him local fame and the considerable fortune that made his wife a wealthy widow, and which was at the time of her second marriage some compensation for the impairment of those graces of person which caused her to be envied of her own sex and the admired of the other, for she is described as having been endowed with physical form and symmetrical proportions, with stately presence and dignified carriage, conscious of her charms, proud and vain of her beauty, alive to and avaricious of admiration and jealous of attentions bestowed by her husband upon others of her sex, of whom she was not fond, having little confidence in the virtue of women and less faith in the honor of men.

This woman, who in her youth possessed such a striking personality as to command attention from the passing throng, believed in her advancing years that she still retained the fatal gift which might claim no worse a husband than the best of men, and at the age of fifty "and upward" she met and married Scott. She was now neither fresh, nor fair, nor perfect in health, whatever might be her conceit that age had not withered nor custom staled her. He had passed the meridian of life, but was tall, shapely, broad-shouldered, a fine figure of a man, somewhat soldierly in bearing, distinguished in appearance, amiable and suave in manner, rather soft and subdued of speech, "genteel in personage, conduct and equipage," in deportment dignified, always cour-

teous, especially to women, all of whom as witnesses speak favorably of his conduct, to them he seemed to be the pink of perfection and propriety, calculated to please their eye and attract their admiration, conscious of his natural physical gifts, not averse to feminine regard,—altogether the style of man to captivate the still ardent imagination and to arouse the flickering embers in the heart of this ancient dame, for she realized what was said by an author, that so long as the hearts of women preserve the feeblest spark of life, they preserve also shivering near that pale ember, a longing for appreciation and affection; and although she was aged, if we may believe one of the witnesses, the heyday in her blood was neither tame, nor humble, nor did it always wait upon the judgment, but it was sometimes as riotous in her veins as in younger days. She had been a widow for five years, childless and alone, and she yearned for love and companionship; she had abundance of material means but the heart hunger was unappeased; she craved for something more than money, and she met Scott and surrendered at discretion to his smooth speech and subduing tongue.

She was a childless widow of fifty-six years; he was a widower of uncertain age, for in this contest he sets himself at sixty-one years, in the marriage license with this decedent in 1889 at fifty, and in the petition for letters of administration upon the estate of his first wife in 1881 his age was stated at forty years, but whichsoever of these ages and dates is correct, whether it be 1841, 1839, or 1837, he was much younger than his second wife, who was born in 1833; she was wealthy, he had no assessable property in his own right and derived no independent fortune through the will of his former wife, who had left her estate, which was separate property, to her three children, to be held in trust by three trustees, Scott being one. The youngest child, a daughter, was in the Atlantic states at the time of his second marriage, and the two boys, aged eleven and thirteen years respectively, he took to his new home, the palatial mansion erected as a homestead by Mr. Collins, and left by him to his widow, who occupied it as her abode until her death. To the new community Mr. Scott added nothing but his portly presence

and his two sons, and they made this house thenceforward their home, contributing nothing substantial to its maintenance, although their father as their guardian had a considerable allowance for their support from the estate of their mother. He himself had been unfortunate in business and at the time he married it does not seem that he possessed any tangible property, although there appears somewhat obliquely, if not obscurely, in the evidence that there was always speculation in his eye and that he had a number of good things in sight, but on his own personal account he had nothing in hand. He had passed through insolvency, into which he had been driven by the conduct of a partner, and came out in his own personal reputation legally unscathed, but had not retrieved his fortunes up to the time when he assumed, through his marriage with the widow Collins, charge and control of her property and affairs. It is said by his intimate friend of twenty-eight years' standing, who has also been his attorney, Mr. Ball, that he was at one time in large business as an importer and commission merchant and was worth considerable money, but he failed through no fault of his own and subsequently engaged in various ventures and enterprises of great pith and moment, and with no notable success, until the opportunity presented by his union with the rich relict of the deceased wine merchant Collins. Mr. Ball, recalling and recounting the business career of his friend and office associate for many years, says that after Scott's mining operations and other various speculations he was ''dealing in real estate and mines and such like'' up to the time of his marriage to Mrs. Collins, ''after that he was a good deal occupied with her affairs.'' The first essay in that occupation was a journey to New York to dispose of a stock of wines, with which transaction she was not satisfied, although Mr. Scott considered it a success and claims to be the author of the achievement. He says that he shipped three thousand barrels of wine to himself in New York City and went there to sell it, and did so, at thirteen and one-eighth cents net; this was in 1889; he sold a part of it himself personally and then his new wife telegraphed him to come home and he came, leaving the remainder with a firm of

brokers there who completed the transaction, which he initi-
ated, on the lines laid out by him. It seemed, however, that
she was dissatisfied and disposed to be querulous about the
matter then and ever after. She advanced him a large
amount of money for expenses which he claimed to have ap-
propriated to that end, and the money was so charged in her
books, but the returns and account sales seem to show that
the expenses were included in the transaction of sale. She
complained to several persons, so Scott says, that he squan-
dered her money, "it was all over town," and this like others
of her petulant plaints was born of mental disease and delu-
sion, but, however this may be, it is plain that immediately
after the marriage Scott assumed dominion over his wife's
affairs and estate. Without a dollar in his own name prior
thereto, the nominal ownership is at once vested in him, and
E. W. Scott's name is even engraven over the portal of the
new wine-house in Santa Clara county. This transmutation
of title was hot on the heels of the marriage.

Subsequently his wife has his name excised and her own
inserted in its lieu, and she resumes the reins which upon her
marriage she had relinquished to him, asserting that her only
safety lay in dispossessing him of control, and expressing
her grievous disappointment in having married a man who
was not capable of acting as an auxiliary in the management
of her extensive interests much less of exercising absolute
dominion thereover.

Whether this was a just accusation or not, it must be con-
cluded as to her own commercial capacity, executive energy,
and administrative ability that her general prosperity throve
apace and that her fortune flourished where others faded and
failed, albeit they were sane and sagacious men of affairs
and she a woman tormented with chronic disease and delu-
sions. Some instances are cited to show that she held out
against the market and special circumstances are adduced to
suggest a lack of business shrewdness, which simply serve to
evidence her stubborn confidence in her own estimate of values
and the conditions of their creation, but even occasional error
in judgment only signifies a tangent here and there in the
consecutive course of her commercial career. By the death

of her first husband she acquired a large estate, $334,000—
less $25,000, special bequests and expenses of administration.
In all the vicissitudes of viticulture and other branches of
trade and industry, from that day until the date of her own
decease, from the zenith to the nadir, she managed so wisely
as to preserve the fortune left to her by Collins with slight
diminution in value; the property devised to her by her first
husband is still there in kind and quantity and much im-
proved in quality, and is now the bone of contention in this
contest; but assuming all this as in proof, is it inconsistent
with contestant's claim that she was insane or a monomaniac,
since business capacity may coexist with monomania or delu-
sions such as are alleged in this case?

What manner of woman have we here who, with unbal-
anced mind, held against the elements of adversity an estate
of such magnitude virtually unimpaired as she received it
from him who with her conjointly created it, when men of
perfect poise and unchallenged equity of intellect went to
the wall in the time of trial during the decade preceding her
death?

One of the counsel, occupying a position in the controversy
somewhat separated from partisan bias (former Judge E. D.
Sawyer), ultimates his analysis of her character in this wise:
A woman of passion, uncontrollable temper, suspicious, jeal-
ous, gross in manners, coarse in conduct, vulgar and obscene,
and yet a good business woman, penurious, exacting espe-
cially in household affairs: altogether an unlovely creature
is present in this sketch of the testatrix.

Mr. Bolton, of counsel for proponents, describes her as a
woman of naturally strong mind, of resolute purpose, great
determination, and indomitable will power; and Mr. Estee, in
his written comment on ex-Judge Sawyer's observations, char-
acterizes her as a "most aggressive person, sane or insane;
as aggressive as any person whose life was ever brought to the
attention of a court of justice." Mr. Scott's own testimony
shows that she was a woman of great clearness and strength
of mind, possessing a power of reasoning and logical faculty.

We have here, then, a case where the possession of general
vigor of mind and intellectual capacity is conceded, but it

is insisted that in respect to the contestant the decedent, was under such an insane delusion that she could not act sensibly in disposing of her property by will: Will of White, 121 N. Y. 412, 24 N. E. 935.

Mr. Shurtleff, in the course of his able argument, undertakes to demonstrate a progressive insanity as manifested by a change of temperament, and supports this theory by citing her early education and rearing and the subsequent lapse into habits of low language and indecorous conduct; he claims that a comparison of her early life with her later years exhibits a marked change in temperament which is an evidence of insanity.

Mrs. Helen L. Gerrish says her aunt was well reared and particular as to dress, and the evidence generally as to her early career proves that she was a lady in appearance and action. The change came later betokening the development of insanity; the precise point of time at which the change of temperament was made manifest is not so easy to ascertain. Such a change is usually so gradual in the system that the terms of the transition are almost imperceptible until the revolution is complete and we become all at once conscious of the progress from normal to abnormal, and recall stages and phases in personal history unnoted at the time of original observation. Such, it is argued, was the case here.

The testimony as to the acts of immodesty in speech and behavior must be considered as produced to establish the theory of general insanity; otherwise it is not of paramount importance, since this case has been reduced to delusion, and fixed or habitual general insanity can no longer be maintained against this testatrix; but her personal history is important, and if there be such a transition in it, as is claimed by Mr. Shurtleff, it is worth while to note it as a circumstance or link in the entire chain of proof. She was undoubtedly coarse and vulgar in her home, where she talked and acted differently from what she was accustomed to on the promenade or in her shopping expeditions about the town, when she affected the airs of an aristocrat and the demeanor and deportment of a duchess, but the pomp of parade was discarded when she reached the cover of her own roof and

appeared among the people of her own selection and hiring, or a few intimates, before whom she threw off her affectation of reserve and reticence and assumed an abandon of act and expression that would put Billingsgate to the blush and cause its fishmongers to hide their diminished heads in shame.

More than a passing allusion to these features of foulness is necessary only because of their being indicated as idiosyncrasies symptomatic of insanity and denoting a radical revolution in her normal nature; but if it appear that these peculiarities were of long duration and had attained gradual growth or been in process of development for many years antecedent to her second marriage, the effect of the argument of counsel for contestant will necessarily suffer eclipse, partial or total, as related to the question of insane delusion.

We find in the revelation of the secrets of her home life an account from the lips of servants and other inmates of her household establishment, stories of speeches, profane and vulgar, obscene eccentricities of allusion, departures from modesty in dress, some sportive gambolings before her mirrors in nature's simplicity of vesture, accompanied by remarks of an original and unique, but morally uncouth, if not grossly indecent, construction. All these exhibitions were in the freedom of her own home, where she might do as she pleased, where there was no one her right to dispute; her conduct and conversation in such circumstances may be criticised, even censured, but predicating insanity thereon is another matter. Sanity and insanity are to be determined by other criteria than these occurrences in such premises. We must take a more comprehensive survey of the situation of sanity, a broader and longer view, than is afforded by the circumscribed boundaries and narrow precincts of the inclosed house and home. We must take the whole life of the subject of inquiry in every observable manner and from every possible point of view to acquire a just judgment.

It is claimed against the contention of contestant that decedent's conduct after her second marriage was similar to what it was prior thereto and while she was the wife of Mr. Collins and during widowhood: the proponents have both by the cross-examination of contestant's witnesses and the direct

examination of their own attempted to show that while she was a widow and also before the decease of her first husband she was profane and obscene in her language, had had trouble with her servants, had broken dishes and smashed furniture, and had suspected that Mr. Collins was unfaithful to her.

This was testified to by Mrs. Meily, a witness for contestant, who knew Mrs. Scott for twenty-seven years, was her niece, her sister's child, now over fifty years of age, and who said that decedent would indulge in the most dreadful oaths and obscenities of speech, and was always addicted to this mode of expression from the time she first saw her when she visited her at her home in Columbus, Ohio, in 1871. Mrs. Meily did not know Mrs. Scott in her early years, but the first time she saw decedent the latter used profane language and the habit continued strong upon her always. Her violence of temper was not exhibited at that time and Mrs. Meily first became conscious of decedent's infirmity in that particular when the former came to California, twenty-four years ago; then she saw her aunt Angelia in those spells of sulkiness and anger in which she gave scope to her destructive propensities. She was always having trouble with her servants and became angry with them without cause. This was before the death of Mr. Collins and also after. Decedent was a woman of very suspicious disposition and distrusted her best friends; she was very irritable and petulant; she drank every day and was in the habit of imbibing intoxicants daily as long as Mrs. Meily knew her; drank whisky three or four times every day. This habit she had during the lifetime of Mr. Collins. She used to pretend to size or measure it in a tablespoon. Mrs. Meily saw decedent several times when she thought she was under the influence of liquor, but this was not during the lifetime of Mr. Collins. Her habit of drinking grew gradually. In the latter years of her life decedent drank harder than before. She was suspicious of the fidelity of Mr. Collins and told witness so many times; all the same with Mr. Scott. Decedent was a woman of striking appearance at the time witness first met her and always dressed very neatly, taking a great deal of pains with her attire. She was proud of her personal beauty, fond of money,

avaricious. Witness knew that decedent smashed dishes and furniture in the lifetime of Collins. Decedent was insanely jealous of her second husband and accused witness of intimacy with him, which accusation was utterly false, and there was no reason for any such imputation. Witness denied ever having been alone with Mr. Scott. Mrs. Meily is a member of St. Peter's Episcopal Church, and when the decedent, her aunt, learned that she had joined the church she cursed and swore violently; this was at Easter time in 1896. Decedent spoke to witness of her suspicion of Scott's intimacy with the domestics and told her that she had employed detectives to track him, and that she herself, in company with her sister, Mrs. Garcia, went in her carriage to three different houses to inquire if there was a woman kept there by Mr. Scott, without result. On one occasion three years ago, in front of her first husband's picture, the portrait of Salvin Perry Collins, decedent swore roundly at it and cursed him and said she hoped he was in the nethermost portion of the infernal regions, or words to that effect.

Mrs. Nellie Swall, a niece of the first husband of the decedent, testified that she knew her ever since she could remember. The witness was born in 1858; her father, Lemuel Perry Collins, died before her uncle, Salvin Perry Collins. Witness used to visit the house of decedent from the time she was a child and spent weeks there together. Decedent and her first husband used to quarrel at times in regard to his drinking. On such occasions each indulged high words and low language. Decedent had a quick temper and when she was cross she swore and cursed at anybody at whom she was angry. Her habits were always the same as wife and widow and wife again; she was very nervous; she had dyspepsia and indigestion and stomach troubles; when feeling well she was very nice and pleasant to everyone. When she became the wife of Mr. Scott she often came in to see witness at her home in Mountain View when she got off the train on the way to her ranch; she got mad at witness frequently and then would swear at her. In the lifetime of the uncle of witness the decedent would accuse him of keeping a woman down town, and of running with that class of women. De-

cedent left her first husband at one time and went to the house of her sister, Mrs. Garcia, and remained there until Collins induced her to return and sought to win her by various kind acts and to reclaim her affection, and he would take her out riding and thus reinstated himself in her good graces. Decedent was very fond of dress and dressed younger than her age. She began taking the massage treatment while she was a widow. As to her sanity, witness thought she was sane; she was smart in business ways.

Mrs. Swall was a witness for proponent and is the wife of George Swall and lived for a part of the time with her sister, who before her decease was the wife of the present husband of witness and had charge of the children, of whom she is stepmother and aunt, and who are minors and legatees under the will in contest. Witness used to live off and on for years with her uncle, Salvin Perry Collins, and subsequently for some time with his widow, and she says that Mr. Collins was a kind and courteous gentleman. He seldom quarreled or gave offense to anyone. Mrs. Collins was not an untruthful woman, but her temperament was excitable. She did accuse witness of trying to poison her, which witness denied. and she thinks that decedent believed her, although she afterward repeated the accusation. Decedent said that Mr. Scott was trying to poison her and trying to put her in an insane asylum. Witness asked her why she married him, and she said it was in a business manner, as she wanted somebody to attend to her affairs and she thought he was capable, but she found he was very different. Decedent did say that Mr. Scott was running after other women; but did not specify any particular person. She had made similar remarks about Mr. Collins, her first husband. She said that Scott was trying to get her out of the way and that he had told her that all that he had married her for was her money.

Mrs. Helen Louise Gerrish, a niece of decedent and a daughter of her sister, Mrs. Frank Garcia, knew Mrs. Scott always. The witness lived in San Francisco prior to her marriage, which was in 1881, and from that time went and lived north in Port Townsend, in the state of Washington. During that period she made frequent visits here, about every year, three

months at a time; one visit was for four months. Witness met decedent always on her visits. Remembers her when she was Mrs. Collins, but he died before witness was married; is now forty-two years of age. When she was a girl she often went to visit Mr. and Mrs. Collins; knew of their having difficulties. Decedent was suspicious of her husband, Mr. Collins. Once she went away from him and came over to the house of the mother of witness and remained there three months. Mr. Collins used to come there to visit his wife and finally induced her to return home. Decedent did not enjoy good health; she had stomach troubles and dyspepsia. Saw her when she was suffering many times while she was a wife and after she became a widow. Saw her at such times exhibit a violent temper when she was the wife of Mr. Collins, also when she was his widow and when she became the wife of Mr. Scott. Never saw her break anything in her transports of passion, but she would swear and curse and have trouble with the servants. Decedent had to be strict in diet. Witness thought she was perfectly sane. Mrs. Gerrish was also a witness for proponent.

It should seem from these testimonies coming from intimate kin that the decedent's peculiarities of behavior were of long standing, and that for twenty-seven years at least, according to her niece, Mrs. Meily, she was habituated to forbidden forms of discourse in colloquial converse, and that there is no line of demarcation to be drawn at or after the time of second marriage.

These eccentric habits of speech were not suddenly acquired, and are not, therefore, to be considered as presumptive evidence of insanity: Taylor's Medical Jurisprudence, 632.

Mr. Shurtleff, however, insists that it cannot be said that this woman manifested merely eccentricities, and that her acts and language are much more serious in their relation to insanity than eccentricity, which is, according to the definition of Dr. Hatch, a peculiarity of character pertaining to an individual, and may be marked by strong or weak individuality, where, as Dr. Maudsley says, the person does not

run in the common tracks of thought and feeling, yet is not insane: Maudsley's Pathology, 59.

Maudsley remarks that eccentricities of this sort may be of all kinds and degrees, from mild and odd to grotesque and silly, running through a scale reaching from actual insanity to the borderland of genius; on the one hand it may ripen into insanity when it is not counterbalanced by a strong judgment which fits the individual to weigh things, himself included, in their just proportions from the outside, and, if need be, to satirize himself as a fool among fools. In Dr. Taylor's Medical Jurisprudence it is said that an eccentric man may be convinced that what he is doing is absurd and contrary to the general rules of society, but he professes to set these at defiance. In eccentricity there is the will to do or not to do. Eccentric habits suddenly acquired are, however, presumptive of insanity.

Instances and illustrations of eccentricities in individuals otherwise noted for intellectual excellence may be numerously cited, such as Dr. Samuel Johnson's habit of touching all the lamp-posts in Fleet street. Balfour Browne says that as long as this was merely automatic it was an eccentricity, but when it came to demand an expenditure of energy it became insanity: Browne's Medical Jurisprudence of Insanity, sec. 255.

A man ever so eccentric will generally reason calmly and rationally upon the subjects upon which he entertains peculiar views; but a monomaniac will, upon an attempt to reason with him, become excited, and reject all reason because the delusion takes full control of his reasoning powers; he is unable to reason upon a subject; the delusion is dominant over all the other faculties; but in a mere eccentric the contrary occurs, and he is even amused and laughs at his own oddities. Many examples of eccentricity in men of high station and of large mental calibre may be recalled from experience or reading, such as dispensing with some nonessential article of attire, or what may be deemed superfluous appanage of apparel, such as a necktie or collar, as in the case of the governor of Massachusetts, George N. Briggs, who was for six terms a representative in Congress, and never wore

a collar, or in the instance of a local celebrity, noted as a publicist and orator, who uniformly dispenses with a necktie; but tested by any definition of eccentricity, suspicion that she would be poisoned by her husband or by those whom he might induce to do so; that he and others were attempting to place her in an insane asylum; that he was unfaithful to her,—all of which suspicions were unfounded, cannot be said to be eccentricities: they plainly indicated a diseased condition of the mind, so far as her husband was concerned. These were well-defined insane delusions, and they operated upon the testamentary act. Suspicions may be entertained to such a degree as to render one insane. As said by the expert witness, Dr. F. W. Hatch, often these delusions arise from misinterpreted suspicions, and the gradual building up of those suspicions finally results in a fixed delusion.

Dr. Hatch is eminent in his profession, and for several years has been connected with the management of insane asylums in this state, and is at this time in chief direction of all the hospitals for the insane in California, and he has given it as his opinion, predicated upon the accuracy of the hypothetical questions, that the decedent was insane and possessed of three fixed delusions: (1) That her husband was unfaithful to her; (2) That he was trying to poison her; (3) That he was trying to put her in an insane asylum; and that if such delusions continued for years they would constitute habitual insanity. Dr. Hatch says that it is a fact that a person of ordinary perception may be acute and accurate, with a retentive memory, his statements reliable in the main, and even his judgment on matters connected with his peculiar train of delusions, belief, or feeling, accepted as trustworthy, but notwithstanding this mental activity he may harbor delusions, not always exposed in casual conversations, which may be called forth by anyone cognizant of their existence and of his cerebral conditions, and all the authorities so hold, and such has been the personal observation and experience of Dr. Hatch himself: 1 Beck's Medical Jurisprudence, 729.

Expert evidence is really an argument of the expert to the court, and is valuable only with regard to the proof of the

facts and the validity of the reasons advanced for the conclusions; therefore, if we find the facts assumed in the question to be unsupported by proofs in any essential particular the conclusion must be rejected; so it must be with the testimony of Dr. Hatch if it shall appear, when the grounds are tested, that there is no adequate reason for his opinion.

Each side in this case, as in all others of like kind, chooses to criticise evidence of this character and to suggest that the average expert is necessarily a partisan in the case. It is not necessary, however, to asperse the integrity, intellectual or moral, of any professional gentleman called upon to testify herein; it is sufficient to allude to the commonplaces of judicial expression that no tribunal would be justified in deciding against the capacity of the testatrix upon the mere opinion of witnesses, however numerous or respectable, and that it is the province and the duty of the court or jury to draw the inference of fact from the evidence before them regulated by the rules of law—being assisted but not superseded in that function by the opinions of experts: In re Redfield, 116 Cal. 655, 48 Pac. 794.

Dr. Hatch says that monomania or partial insanity is characterized by some peculiar illusion or erroneous conviction imposed upon the understanding and giving rise to a partial aberration of judgment, and the individual thus affected would be rendered unable to think correctly on subjects connected with the particular illusion, while in other respects he would not betray any palpable disorder of the mind; this is according to authority and is the result of this doctor's experience: Hammond on Insanity, 13-24.

It is a fact that in conversing with patients on topics foreign to their delusions one will find no difference between them and other persons untainted by mental malady; they seem sane on all subjects until one strikes the spring which is the source of their intellectual disturbance: Ray, sec. 285.

In the case assumed in the hypothetical questions propounded by counsel for contestant, where a woman born and reared in respectable circumstances, fairly well educated, and surrounded by wealth and luxury, with all the advantages of wealth and position enjoyed by her for many years, mani-

fests at an advanced period of life, say at the age of fifty or sixty years, a complete revolution in her external character, and frequently, when under excitement, and at other times when calm, and without apparent cause or reason, both in the presence of servants and of acquaintances and comparative strangers, indulges in vulgar, profane, obscene and blasphemous language, breaks dishes and smashes things generally, and goes around naked and unadorned, and perpetrates other acts and antics of an abnormal character, she is insane.

Dr. Hatch's answers to the hypothetical questions propounded to him were based upon his understanding that the phenomena presented therein appeared after the marriage of the lady to Mr. Scott. He took it from that time as to one of the hypothetical questions, the first question went before her marriage to Mr. Scott, to 1884 or 1887 or somewhere along there; but he took the whole business of it, and his judgment of her mental state proceeded on the accuracy of the assumptions postulated in the entire proposition. His conclusion was dependent upon their truth; if the hypothetical questions were so framed as to show that for many years she had been obscene in her language, violent in her conduct, profane, suspicious of her servants, and of everybody around her, charging her former husband in his lifetime with immoral conduct and infidelity, and that for long years she had been drinking to excess, such facts should be taken into consideration and would affect the conclusion as to her sanity; and if it should appear that her associations had been mainly and almost entirely with her servants and with men whose customary conversation was unrefined, and that for a quarter of a century prior to 1896 she had been suspicious, irritable, annoyed at trifles, unable to retain domestics on account of her crankiness, and that she had been during this period immodest at times in her deportment, all these facts would be taken into estimation as lessening the importance of the symptoms.

Dr. H. N. Rucker, an accomplished physician and surgeon, now president of the board of health in Oakland, and formerly for a term of four years superintendent of the Stockton Asylum, and three years and upward director of that in-

stitution and now engaged in general practice, but continuous in his special studies of insanity and often called in consultation in such cases, concurs in the opinion expressed by Dr. Hatch, that a person such as is described in the hypothetical questions must be insane. Dr. Rucker says that such a person would have habitual mania characterized by fixed delusions. In conversation with insane persons there is no difference between them and others in speaking on topics foreign to their delusions; that is to say, this is true of persons possessed of delusions upon certain subjects, or monomaniacs. Of course, in answering hypothetical questions, the correctness of the premises is assumed.

In commenting upon this evidence, Mr. Shurtleff naturally lauded his own side and said that the testimony coming from the other side of an expert character showing at the times they came in contact with her she was rational, is of no importance, when it appears that their acquaintance was of a slight and casual kind, not affording an opportunity to judge of her mind from all around observation. These mere business acquaintances, seeing her for a few minutes only at a time and then on some special subject, foreign to her delusion, are clearly inferior in value and weight, and cannot furnish a safe criterion to establish a conclusion of sanity; they did not see her in circumstances calculated to enable them to form an intelligent opinion of her calibre or capacity. A person possessed must be under observation for some time and under a variety of conditions in order that her delusion may be detected. An insane delusion may be concealed from many who occasionally meet a person and whose conversation and observation are contracted by the circumstances of the occasion, while a few who are within a closer social circle with superior chances for inspection of all sides of the subject will be better able to pronounce a more perfect opinion, because the delusion is more liable to develop itself under the provocation or inducement of general or protracted and local intercourse in the home circle. where the conventional circumspection and guards which obtain outside are not always maintained. At home, where she was at ease, she spoke freely; abroad on business she kept a guard on her mouth.

It were well if she could have pursued the precept of the preacher and practiced his lesson of virtue always and everywhere, at home and abroad, to set guard on her mouth, a sure seal upon her lips, that she might not fall by them, and her tongue destroy her not, and that she might have put up her petition as did David, when he cried out,—

"Set a watch, O Lord, before my mouth;
And a door round about my lips;
Incline not my heart to evil words,
To make excuses in sins."

But she cared little, according to all accounts, for preacher or psalmist, and preferred a tongue sharpened like a serpent with the poison of adders under her lips.

That decedent uttered apprehensions of being poisoned and implicated Scott appears from the evidence. In 1889 she made statements to that effect to Mrs. Meily and A. E. Ball; in 1890 to Lloyd Scott, Wesley Scott and Mrs. Paisley; in 1890-91 to Joseph Mortier, and from 1890 to 1897 to Geo. F. Dyer; in 1891 to Major Hammond, Miss Richards, and T. H. Froelich; in 1892 to John A. O'Dea and Thomas Talman; in 1893 to Revilo F. Morton; in 1895 to Mrs. Ogilvie and Miss Anderson; in 1896 to Mrs. Cook, and in 1897 and 1896 to Miss Gustafson; in 1897 to William Warwick, Mrs. Burnham, Dr. Spencer, Dr. Mays. Dr. Spencer examined matter for poison, at request of Dr. Greth, who took the matter for examination at instance of Mrs. Scott. Many of the witnesses for proponents testified to similar statements; in 1891-93 Mrs. Scott so spoke to Edward Lewis Brown; she also made mention of her fear of poisoning to several others on the same side, Mrs. Gerrish, Mrs. Putman, Mrs. Nellie Swall, and in 1897 to Wealthy Wormell. A. E. Ball testified that she made the remark to him that she had to keep her whisky under lock and key to keep it from being poisoned, for she was afraid that somebody whould put poison, or something of that kind in it. Lloyd Scott said that she complained that his father was trying to poison her, that he would get the cook to do it for $10. Lloyd and his brother Wesley always tasted her food at the table at her request to see if it was poisoned; she claimed her whisky

had been poisoned with arsenic. Lloyd's brother, Wesley, testified she said his father was trying to poison her, and he used to have to taste her food every day to see if there was poison in it. He thinks it was about the month of July, 1890, when he came back from New York when he first heard Mrs. Scott say that his father was trying to poison her; she talked about it most every day. In cross-examination Wesley modified his statement about having to taste the food every day, and said that his stepmother would have periods of two or three months that she would make him taste it, and then the rest of the time she would not care about it. This might seem to show a suspension of the alleged delusion for nine or ten months at a time. So in regard to this item, it was not continuous, persistent, or fixed.

Mrs. Paisley said that Mrs. Scott stated that there was poison in her food, principally mush. Mrs. Paisley could not tell how frequently this statement was made to her by Mrs. Scott.

Joseph Mortier testified that she said Mr. Scott was trying to poison her, this was some time after Scott came back from New York, in the latter part of 1890 or 1891; she said it at different times during that period.

George F. Dyer testified that she accused Scott of trying to poison her. Dyer went to her house one morning; she sent for him and she sent word downstairs that she was sick and wanted him to come upstairs, and she said that she had been poisoned by Scott or somebody else in the household that he had employed to do it. She said her husband was trying to get away with her, trying to kill her, to get her property and poison her.

A. C. Hammond testified that she said that she was afraid of her life, except for the presence of the children she did not know that she would be safe from poisoning. This was in a conversation with Mrs. Scott in 1891, relative to her husband; the second or third interview Hammond had with her, somewhere about August, 1891, she spoke of the use of poison by her husband.

Miss Richards said that Mrs. Scott said that they intended to poison her, accusing Mr. Scott and those all around her.

Theodore Froelich said she told him that Scott and Mr. Ball were poisoners; this was in 1890 or 1891.

John O'Dea testified that she said the people were trying to poison her and did want to poison her. Thomas Talman testified that she said Mr. Scott or some one else was trying to poison her. She asked Talman if he would taste the milk; he tasted it and said that there was nothing the matter with it at all. She said to this witness that he would poison her as quick as anybody, to which the witness replied that he had no object in poisoning her, because he did not think that she would ever leave him anything.

To Revilo F. Morton in 1893 she said that Scott was trying to poison her, and that she had been poisoned before Morton knew her.

To Mrs. Ogilvie she accused Scott of having put something in her enema several times. Mrs. Ogilvie would be there fixing tea for her and she told her to hide it for fear Scott would put something in it.

To Ulrica Anderson she said he tried to poison her. Ulrica had to take an egg every morning and beat it in her room, so that he should not be able to poison it; she had to taste her food so that no poison could be in it. Mrs. Scott was afraid there was poison in it. She charged Mr. Scott with trying to poison her. Ulrica had tasted the food before Mrs. Scott ate it and was none the worse for it.

To Mrs. Cook decedent said that Scott would poison her whisky. Mrs. Scott kept the whisky locked up and used a little every morning with an egg.

To Ida Gustafson she said he tried to poison her and she used to ask Ida to taste her beef tea for her. She would accuse Mr. Scott of poisoning her steak and her beef tea, and Ida would have to taste it in the mornings before Mrs. Scott would drink it. Mrs. Scott said that it would not affect Ida as she was stronger than herself.

Mrs. Scott asked William Warwick if he thought that Scott would put any poison or anything into her liquor when she drank.

Mrs. Burnham testified that Mrs. Scott would talk to her about how Mr. Scott was trying to poison her. She thought that the food and almost everything she ate was tampered

with. She suspected that Mr. Scott had some one put poison in it—if he did not put poison in it himself; that he had the cook or the coachman put poison in it. Mrs. Burnham always had to taste Mrs. Scott's steak, her cream, or her mush before she would use it herself.

Dr. Spencer testified to the signing of a certificate to the effect that the articles brought to him by Dr. Greth at the request of Mrs. Scott contained absolutely no poisonous matter. Dr. Mays said that Mrs. Scott told him that people were trying to poison her and that she had some one to taste her food before she would eat it. Dr. Greth took the articles in the certificate signed by Dr. Spencer at Mrs. Scott's request, because she begged him to have it done for her. These were all witnesses for contestant.

To Edward Lewis Brown, a witness for proponent, she made a statement that some one was trying to poison her food. She said she was afraid Scott would poison her, and she gave as a reason that Scott was a young man and she was an old woman, and she thought that therefore he would try and poison her, and that he was no husband to her. Mrs. Helen Gerrish says she heard Mrs. Scott say she thought Mr. Scott might poison her. She accused Mrs. Nellie Swall of trying to poison her and made this lady sometimes taste her food. Mrs. Swall told her that she was not trying to poison her, and thinks she believed her, although she afterward repeated the accusation and she talked to her about Scott's trying to poison her. Mrs. Scott told Mrs. Swall as a reason why she thought Mr. Scott was trying to poison her was that he was after her money; that he married her for her money and was trying to get her out of the way. She told her this down at the house in Mountain View the year Scott returned from the east after doing some business for her.

Wealthy Wormell heard Mrs. Scott say once there might be poison in the food; she did not say who might be poisoning her food.

Mrs. Scott told Mrs. Putman that Scott had been trying to poison her.

Mr. Grossman does not remember much about any statement of the kind, although he might have heard something, but found it hard to "memorize" anything.

It is claimed by counsel for contestant that the delusions existing in the mind of the decedent as to Scott's unfaithfulness to his marriage vows with servant maids and other women and as to a conspiracy to send her to an insane asylum are also established by these witnesses, whose testimony may here be summarized in these respects:

Miss Ulrica Anderson was employed by Mrs. Scott at her house in this city as an upstairs girl; went there in April in 1895, and left there in August, 1895. Mrs. Scott was a woman of very violent temper and used coarse language. Ulrica was her maid. Mrs. Scott was in the habit of using oaths and obscene words: she would fly into a passion and become wild, tear her hair, slap her face, pound the tables. and break articles, throw them down on the floor, smash crockery, whatever was near at hand; any trifle would start her. She was most excitable, a proud and vain woman, very vain of her personal charms; she would at times undress and dance before her mirror and display her figure in that manner with evident self-admiration; she had a fine form, and soft, white skin, clear and free from blemish, tall and well developed, proportions ample without angles, easy curves; she had massage treatment, not from her maid, but from a regular masseur; she was very jealous of Mr. Scott; she was anxious to obtain some knowledge of wrongdoing on his part; she said she would give Ulrica $1,000 if the maid would try to inveigle him into sleeping with her, but the girl declined to engage in any such enterprise and told her that she was virtuous and would not allow herself to entertain so vile a proposition. Mrs. Scott was quick-tempered, strong-minded, obstinate, violent in her anger; and she broke out constantly and without cause, but Mr. Scott was a modest and nice gentleman.

Mrs. Estella Burnham, who is now living at 1743 Franklin street, the Scott mansion, knew the late Mrs. Scott and was engaged as her maid from June 18, 1897, to the summer of that year, and was with her from 6 o'clock in the morning until 9, 10, or even 11 o'clock at night when she retired. She spent her nights at the house of Mrs. Scott and had a separate bedroom. Mrs. Scott's constant topic was the supposed infidelity of Mr. Scott, whom she accused of unfaith-

fulness with the various girls in service and also with a Mrs.
Meily, a niece of her own, and with a Mrs. Paisley, a sister
of her first husband, an elderly lady. Mrs. Scott never ac-
cused Mrs. Burnham to her face, but she did say that all
women were bad and that she would not trust any woman,
and that she would give $1,000 to any girl who would seduce
Scott so that she could catch him in the act. She just
suspected that Scott was running around all the time with
the women when he was down at the ranch, that was her
sole subject of conversation from morning until night. She
was always talking of her suspicions of her husband's in-
fidelity and of his poisoning of her and putting poison in
her food and drink, and Mrs. Burnham had to taste what
Mrs. Scott ate and drank before she would touch anything
for fear of poison. There was nothing of the kind in reality,
no poison in the house; there was not the least provocation
for her spells. Mrs. Burnham could always tell in advance
in the morning when Mrs. Scott was going to have a bad
day; her eyes would show when she slept ill and she would
be wild in her appearance, and then they would have a time.
She was always harping on the same subject—Scott's
amours. She was desirous of finding out whether he was
really true. After Mrs. Burnham left on the 4th of De-
cember, 1897, she visited the house several times but did not
return to the service during the lifetime of the decedent.
While she was there witness was asked by Mrs. Scott to act
as a detective three times in two weeks, and pretended to
comply and put on a sort of disguise and went out and came
back without any discovery, but made no attempt to pursue
him, as she would not do so except by way of pleasing Mrs.
Scott, as she was in her employ and necessitated to make
this pretense of watching him to retain her situation; so she
consented to play the part.

Frederick J. Bockwoldt was foreman of the Scott ranch
in Mountain View for a while. Mrs. Scott used to send for
him to come to her room every time she came down to the
ranch to talk with her. He often went and spent an hour
or two at a time; at first she would talk about business, but
after a while she would converse about Scott, and said she
believed that he was unfaithful to her with certain ladies

in the vicinity, and she asked Bockwoldt to find out if this was not true. He told her that Scott never went off the ranch except accompanied by him and Lloyd. Mrs. Scott's conduct was immodest in the extreme, and she would talk in the most shocking manner.

When Mr. Scott was in the east Mrs. Scott sent for A. E. Ball and complained of Scott's infidelity and that he was running with other women, and that he had taken a woman east with him, in 1889.

Mrs. Cook worked for Mrs. Scott in 1896; was employed as a servant doing the upstairs work. Mrs. Scott was in the habit of using very bad language, and said that Mr. Scott was running after every woman in the city; she said she never could keep any girl more than a month, then they slept with Mr. Scott. She wanted her to sleep with him, offered to give her money if she would do so, but Mrs. Cook told her that she did not want to make money that way and refused to consider seriously her proposal. Mr. Scott was calm and considerate to all and always tried to pacify his wife, but she was not to be quieted. She was always talking of Mr. Scott's running with other women and wanted to catch him.

George F. Dyer knew Mrs. Scott from about 1890 until three or four months before she died: saw her as often as one hundred to one hundred and fifty times. In the earlier times his opportunities of seeing her were considerable; she engaged him to sell her ranch in Santa Clara; she used to get him to call at her house with data about the ranch; this was about the spring of 1891; perhaps in June or July. Dyer had some purchasers for the property; she said she wanted to sell; she sent the persons down to see the property and on their return Dyer entered negotiations, and when they came to the house to do business she "flew off the handle," and raised the price. She talked to him on a great many subjects besides business; she used to say that she was perfectly willing to sell, but she was afraid that the money would fall into somebody else's hands; she talked about Scott running after women and wanted to find out what he was doing; she would send for Dyer down to his house to come there at all hours of the day and sometimes

at night and wanted him to track Scott on his alleged amorous adventures; she said that she suspected that Scott and Ball and another man were concocting a plan to rob her, and she was afraid of being poisoned. Mrs. Scott told Dyer that her husband had said that she was insane, and that they were trying to put her into the asylum or plotting to get rid of her in some way. Dyer had known Scott for fourteen or fifteen years and he was always a gentlemen in his behavior. Mrs. Scott would use very coarse and indelicate language, obscene and vulgar, and witness gave a sample of the coarsest quality which he said made the hair stand on end. She called Scott by the most opprobrious epithets before this witness in speaking of him; nothing was too vile or vulgar for her tongue; this was from 1890 to 1893. Her manner of talking on subjects was such that Dyer quit trying to do business with her, as he did not consider her competent to transact business. Dyer was invited to her house to dinner; she invited him there to talk about the ranch and then asked him to remain to dinner. He sat down to the dinner table and after two or three minutes she ordered him up and out of the house and he went out. He saw no reason for this conduct and she gave none except that he was a friend of Scott and that he was trying to get the ranch away from her or something of that kind. Dyer thought the woman was crazy; that she did not have her right mind; and his reasons were because she floated from one proposition to another; she would take the property away from him one day and give it to him the next, and wanted to employ him as a detective to pursue Scott and find out and tell her about this woman; and she frequently visited Dyer's house —came down there without any apparent cause whatever. She would curse Scott at her own home and she would send for Dyer at all hours, and when he got there he found there was nothing to it, therefore, he thought she was not a woman of strong mind.

It appears that Dyer first made the acquaintance of Mr. Scott in 1884, when the business of witness was mining, and that he was intimately acquainted with Mr. Ball and his mining operations with him and with Mr. C. C. Tripp, and had been to the office occupied in common by these gentle-

men during all the years since 1884, and whenever he called there he always saw Mr. Scott. Mr. Ball told Mr. Dyer that Mrs. Scott wanted to sell the ranch, and Scott introduced him to Mrs. Scott, but he cannot recall who introduced him to Mr. Scott. Dyer says he was looking for a piece of property and Mr. Ball told him that the Scott ranch was for sale. Then Scott introduced him to his wife, and Dyer had a talk with her at that time alone, her husband left after the introduction; Dyer went in with her into the little office off the hall in her house and Scott went outside somewhere. She and Dyer had quite a talk for about an hour; she did not give him a description of the ranch but gave him the outlines; she did not seem to have her mind made up as to price at that time and asked Dyer to call again. He went back there the next day or a day or two afterward alone; was there about an hour and a half or two hours. Mrs. Scott and he were discussing the ranch, she going into the minutest details about all its phases of income. area, acreage, number of vines, their age, condition of improvements, character of soil and climate, expense of operating ranch, number of men employed, amount of machinery upon the property, cooperage, storage, the buildings, and all the details; she gave him a paper, a report of all the property and all of those items were in it. The two conversed for an hour and a half on that topic and incidentally on others.

Theodore H. Froelich, a wine broker, who formerly lived in San Jose, and was engaged as a wine-maker there, knew Mrs. Scott before she married her second husband. He had had many conversations before and after that time. She told him at one time that she had thoughts of getting married again, and said she was a foolish woman to think of such a thing. When she married she told Froelich of it and that she had met a man to her liking, and she introduced Scott to him, and he told her that he thought she had made a good match and that Mr. Scott would make a good husband. Froelich gave up his business in San Jose in 1891, and returned and set up as a broker in San Francisco in the fall of 1892. He had been ten years in business in San Jose and the acquaintance begun with Mrs. Scott there was continued here. She was frequently in his office here on busi-

ness; he acted as her wine broker and she called two or three times a week and sometimes every day. Froelich handled her wine for local and eastern markets. When she called she would often talk about her domestic affairs. She was very jealous of her husband and said that he was running after other women and that she knew that he and Ball had concocted a conspiracy to send her to an insane asylum and deprive her of her property. Her language was very vulgar, profane, and obscene beyond description. She was a good friend of witness so far as giving him the business was concerned. One could not cheat her for a cent, but still Froelich did not consider her a good business woman. She was mean and parsimonious, and they had a quarrel finally on their business relations, which resulted in a lawsuit still pending.

Ida Gustafson was employed as a servant in the house of Mrs. Scott at two different times, first from October to December, 1896, and last from April to June, 1897. Mrs. Scott was very rough in her talk and Ida could not repeat her language, it was so bad. She was very violent in conduct—half crazy. She said she paid $100 a month to a detective to watch Scott and that she was willing to pay a girl to trap him into intercourse. She was very jealous of Scott, broke all the furniture in his room at one time; she would go around naked and dance about the room before the mirror because she was so well built. Ida was of opinion that Mrs. Scott was insane; her constant talk was that her husband was unfaithful.

Anselm C. Hammond was employed by Mrs. Scott, then Mrs. Collins, to copy the will of her first husband and to find out what became of the proceeds; this was in July, 1891. He did so. He frequently conversed with her from that time until 1897, the burden of her talk was that her second husband was unfaithful to her. She spoke of his having intercourse with her nieces and others. She told him that Scott and Ball, one of the attorneys in this contest, were trying to railroad her into the insane asylum. Her language in reference to her husband and his habits with women was such as Hammond had never been accustomed to in a woman. It was vulgar and obscene to a degree. She

charged Scott even in 1891 with running with women. Hammond formed the opinion in 1891 that she was not mentally sane after he had made returns to her about the Spring Valley Water stock which were unsatisfactory, and because of her dissatisfaction at his work, Hammond became annoyed; she spoke about poison and Scott's infidelity to her; she was continually talking about being railroaded to the asylum by Scott and Ball. Hammond had never seen anything wrong in the conduct of Scott. His office was and is at Room 39, Merchants' Exchange, and Mr. Scott has a desk in the same office. Hammond is an expert accountant and was employed by the decedent in 1891. He made a report to her before August, 1891, the report was unsatisfactory to her and that annoyed witness greatly.

Mrs. Ella Joseph went to live at the house of Mrs. Scott at the time the husband of the decedent was in the east; she was very vile and violent in her language—in fact the conduct and conversation of the decedent were so coarse and vulgar that witness told her that she would lose her grace if she remained there. The witness was a church member—Third Baptist Church. She never stopped in the house of Mrs. Scott at nights, but was there about a year and a half. Mr. Scott had gone east but a short time when this witness went to live there, and after he returned she remained there about eight or nine months. When witness went there after a little while she asked Mrs. Scott if she had a husband. She answered, "Yes, of course I have." Witness then said, "You will excuse me if I intrude, but where is your husband?" Mrs. Scott said that he was in the east with a woman. She was always talking of his running with a woman or women; accused him to the witness of improper conduct with the servants in the house and with other women. So far as witness saw, Mr. Scott was a very nice gentleman in his behavior.

Joseph Mortier is an orchardist and wine-maker; was so engaged at Mountain View at the Scott ranch from July, 1889, to September, 1892. Mrs. Scott used to come on an average about once in two months; she used to talk to Mortier about Mr. Scott, and asked him if Scott did not visit a certain widow and some young ladies in the neighborhood,

very respectable persons, and witness told her not so far as he had observed. The witness considered the decedent insane, because she could never carry on a talk for ten minutes at a time, and she would jump from one subject to another. Witness thought she was off on the point of jealousy of her husband.

Revilo F. Morton went into the service of Mrs. Scott in January, 1893, as bookkeeper. She used to talk to him for hours; she began to talk about her husband as early as March, 1893, and continued that way until her death. The first conversation was when she sent for the witness and talked to him for three hours. Among other things, she said that Scott wasted and squandered $100,000 of her money in the first year of her marriage. The decedent also said that her husband was not faithful to her and was familiar with the servant girls. She said that he had sold the Spring Valley Water stock. Mrs. Scott also said that she had been defrauded in her first husband's estate, which ought to have been worth at least $500,000, but only came out about $275,000, and that through Mr. Estee and his partner, Mr. Wilson, she had been robbed of the remainder. She said that her first husband had said he was going to buy the Stevenson building, and she thought he must have had another box in the safe deposit vault wherein were contained other securities that were not in the inventory of his estate. She had no confidence in anyone. She said that Scott was trying to poison her and that she had been poisoned before the witness knew her. She told Mr. Morton once that she had a circus with Scott at the breakfast table and she smashed all the crockery, and she said that when she had one of those spells she must smash something. She told the witness that she was making a codicil and she was going to give Scott very little and cut Mrs. Meily off with a dollar because they had been intimate. In her figuring on the prices of her wines she was frequently at fault; she would ask such prices above the market rate that she could not secure a purchaser. In his opinion she was during this period insane, his reasons being then and now that she entertained those suspicions of certain acts and persons which had no grounds for her beliefs. In all the time that Mr.

Morton knew her he found no ground for her belief or accusations of fraud and poisoning and of the infidelity of Mr. Scott; quite the contrary was the result of his researches and observations. She used in her talk so much profanity and vulgarity that the witness could not believe that any woman who talked that way habitually could be sane. If she were asked a price for the wine she would take the market rates and then she would add several cents and insist upon this higher rate, which could not be obtained. She would insist upon such quotations in advance of the local market prices. She made a price higher than others in the business. He did not think she used good business judgment in such a case. Her custom at the banks was to borrow money on her own note without security to carry on the ranch. She borrowed money from the Bank of California and the First National Bank. She borrowed $25,000 at one time and at the time of her death she owed the latter $35,000. Mr. Morton kept the books from data furnished by her.

Mrs. Anna Elizabeth Ogilvie was a seamstress for the late Mrs. Scott, who was all the time complaining of her husband, Mr. Scott, and telling how he had connection with all the girls who were there, the servants in the house and then went down town after other women. She said he had intercourse with the colored girl in the front room, of which she had auricular evidence as she had heard the bed shake. She also said he had improper relations with her own niece, Mrs. Meily, as she had stood at the latter's door and had heard the sounds which satisfied her of the fact. She would follow Scott all around the house calling him vile names. This would happen nearly every day. Mrs. Scott told the witness that she had a bad temper, which she inherited.

Mrs. Catherine O'Connor worked for Mrs. Scott from 1889, two weeks after her marriage to Mr. Scott, off and on until last October, 1897. She would go to work in the morning at 8 o'clock and leave at 5 o'clock in the afternoon; never slept in the house, as she had her own house and home for many years. Mrs. Scott talked to this witness a great deal and the strain was always the same—the alleged infidelity of her husband, whom she continually accused of dalliance

with other women. She was jealous of a colored girl in the house and used to stand nude looking over the banisters, and witness asked her why she stood there in danger of cold, and she said she was watching Scott and the colored girl downstairs. She used very vile language; witness never heard anything so low. She told the witness that the reason why she had hired the colored girl was because Scott was after all the white girls and she was going to give him enough of it now. Mrs. O'Connor never heard her say anything about Scott except that he was untrue to her and all she feared was that he would put her into an insane asylum: in the opinion of the witness Mrs. Scott was crazy—strictly crazy.

Mrs. Eliza J. Paisley deposed that she lived in California once upon a time from April to August, 1890, on Franklin street with Mrs. Scott. Mrs. Paisley is the sister of the first husband of decedent, Salvin Perry Collins. Witness went there by her invitation. She had a great many conversations with Mrs. Scott, who talked a good deal about Mr. Scott, finding fault with him about being untrue to her in a great many instances. She accused him of numerous illicit actions. Witness could not tell as to their truth. Mrs. Paisley lived there three months and saw the decedent and Mr. Scott every day and was always treated "extra well" by him, he never making any improper advances to her. She never saw anything improper in his attitude toward anybody. His conduct was everything that was right toward everybody and he always behaved himself. While she was there Mrs. Scott did not conduct herself in relation to her person as she thought becoming to a woman. She had seen her do a great many things that were improper; as exhibiting herself in a naked manner, dancing about in the room before a glass—when she did that she was naked. The deponent had heard her make threats against Mr. Scott and his children. She saw her use a pistol not exactly to him, but she would say she could shoot and would shoot Scott sometime. She did not threaten to kill him, but she threatened the children. Sometimes when she would be carrying on she would say, to spite Mr. Scott she would do something to the children. At one time she said

she could poison those children, by putting something on their lips. When the deponent left to go home they came to see her off. In the last conversation she had with Mrs. Scott at the ferry, the latter said that she would draw blood, or felt like doing so, before she got home. Mrs. Scott was highly wrought up at that time.

Edward G. Perkins first met Mrs. Scott at Pescadero in 1872; she was then Mrs. Collins. He did not have any further acquaintance with her until 1891, when he went to see her about purchasing a horse that he heard she had for sale; nothing came of that. It was with Mrs. Scott that the witness had the conversation about the horse and its pedigree— Mr. Scott not knowing anything about the pedigree of the horse although he knew of the negotiations; he took no part in that. Mr. Perkins was about three months pottering over the matter of the negotiations for the sale of the ranch. His compensation was to be dependent upon the success of the sale, and that never came to pass. He was then engaged in buying and selling mining stocks on his own account through a broker. Mr. Scott knew of the negotiations about the sale of the ranch, and he said to him once that he did not think it worth the while of the witness to be carrying on the affair as the decedent would change her mind so often, and after a while it so turned out; the matter dropped off and after about three months of vain negotiations the end came. When Mr. Perkins first met her in 1891 he thought she was one of the most villainous women in her tongue he had ever encountered, but after a while he came to the conclusion that she was insane; her vile language and violent actions convinced him that she was insane. Sometimes she would put her hands to the side of her head and pace up and down the room and talk to herself incoherently and then break out into a torrent of indescribable vulgarity.

Mrs. Annie J. Robinson knew decedent from October, 1889, to January, 1890; witness was acting as maid for her; at the time she was there Mr. Scott was in New York and returned two weeks before witness left. Mrs. Scott was in the habit of saying that Scott had a woman with him. She was very vulgar and profane in her expressions. She

removed her clothing and exposed her person, saying she was a perfect Venus. She took massage at times, but it was not for that purpose that decedent undressed before witness; it was for no other reason, so far as witness could observe, but that Mrs. Scott should ask her opinion about her form as to being a perfect Venus. Witness did not think decedent was a Venus nor did she consider hers a pretty form, but did not say anything. After witness left Mrs. Scott's house she went to work elsewhere. She had no quarrel with Mrs. Scott, but could no longer put up with her—existence ceased to be endurable with her.

Miss Elizabeth Jane Richards, dressmaker, went to work sewing for Mrs. Scott about a year after her marriage to Mr. Scott, say from 1890, and the decedent frequently rode out to the home of witness on Point Lobos avenue and spent the whole day there. When witness first went to the house of deceased Mr. Scott was absent in the east. Witness was there then for a week. She met him first on the second or third occasion of her working there. He came into the room and Mrs. Scott introduced witness to him; prior to that time witness had never met him. Witness used to stay at the house of decedent as much as two weeks at a time, sewing all day, and decedent would spend the time with her. Witness never spent a night there but took her luncheon and dinner at that house. On the very first night or the first day that she spent there decedent presented herself in the room before the witness stark naked and asked witness if she did not think she had a fine figure and form and was a well-built woman, and if there was any occasion for Mr. Scott to go after other women. The witness said she did not know, as she made no studies of ladies below the waist line, and told her that she wished she would not act in that way before her. The decedent was always talking about Mr. Scott, and his consorting with women, the servants in the house and others whom she suspected. She made threats of killing him often, and said she would shoot him to death if she caught him with a woman; said she would give $1,000 to any girl who would seduce him and sleep with him. She said that Judge E. D. Sawyer and Mr. Ball were con-

spiring to railroad her to an insane asylum but that she would see them in hell first. She was very coarse and violent in her speech—most profane and vulgar. She would dance before the mirror, wring her hands and carry on at a great rate; she would also indulge in high kicking; she would square off before her mirror and spar and swear at herself. Witness did not remember the names of the girls who were there at that time—decedent had so many girls; she would have three in a day. Witness could not keep track of the girls; decedent had about one for every day in the month. She would discharge them; they would not stay with her because her wrangling and her actions were so bad that they could not stand her and the food was insufficient. Decedent had to get three different girls in a day in order to get her work done. She would have to do it herself and go on her hands and knees, yet notwithstanding that fact witness remained with decedent eight years.

E. D. Sawyer, who is an attorney and counselor at law and has been practicing for forty-odd years in this city and state and was formerly for a term of six years judge of the old fourth judicial district, prior some years to the adoption of our present state constitution, and is now representing in this estate and contest absent and minor heirs by appointment of the court, cannot say that he had any acquaintance with the late Mrs. Scott. Mr. Ball was at one time his partner, but witness had nothing to do with Mrs. Scott and had no hand, act or part in any plot against her.

Lloyd Nudd Scott is now twenty-one years of age, a student in the University. He first saw Mrs. Scott about a month before her marriage to his father, who took his brother and himself to see her. This was in October, 1889, when witness was fourteen years old. Witness and his brother accompanied their father to the train when he went east. She said that he had a woman in the car with him; she talked about his father all the time in 1889 and 1890, as to his running with other women; she took the lock off his door so that she could go in and see if he had any servant girl with him; she told Lloyd that she put a thread on the stairs to see whether the girls went up or down at night; she said that

he and Ball were trying to railroad her to an insane asylum; she used to say that the servants in the house were lewd women who came there to rest up and that father was intimate with them. These tantrums or spells would last for a long time and then she would quiet down for a while and express her regret for her conduct, saying that she did not know what she was doing while she was in such a condition. She would throw herself into a terrible tantrum and become so violent and irritable that everyone was obliged to let her have her own way for fear of the consequences, and after one of those tantrums his father, his brother, and himself were obliged to leave the house and go to the Hotel Langham, and after that to the Geysers, whence they returned to the house on Franklin street, upon the receipt of a message from her. After a short respite she would renew her conduct. Father used to ask her to come with him to the theater, but she would decline on the ground that she had to arise early. She spent her evenings at home and so did father. She was not given to reading but a great talker on one topic. Father would not remain to listen to this but would get up and go out. Wesley testified to the same effect as his brother.

Thomas M. Talman lives at 1743 Franklin street, the house of the late Mrs. Scott, and is attending to the garden there. He was first engaged by Mrs. Scott in 1892 and continued in his employment until 1894. His occupation consisted in attending to things generally. Mrs. Scott began to talk about her husband to him from the first. At the ranch she talked to him for hours on the same subject. On one occasion while he was attending on Mr. Scott, who was ill and under the weather, he occupied one room and she another room; the witness was up nights looking after him; the decedent came into the room clad only in a chemisette and went to the fireplace and raised her garments in the rear with her back to the fire, the witness being in front of her. According to Talman she was always flighty in her talk, jumping from one subject to another, no connection in her talk. The witness took charge of the chickens and some of the horses. They had three or four hundred chickens. The pay of the wit-

ness was ten dollars a month. He has been now (March 31, 1898) about three or four weeks at Mr. Scott's.

John F. Uhlhorn was introduced to Mrs. Scott at her house by Mr. Scott in the year 1891, and after the introduction Scott went out and Mrs. Scott at once engaged in conversation with the witness and began by asking him if he knew that Scott and Ball were trying to railroad her to an insane asylum. Witness answered that he did not. Mrs. Scott said that it was so, and she went on with a tirade, swearing vociferously, saying that Scott was running after women and cohabiting with all the women that he met and with the servant girls in the house. Uhlhorn formed the opinion she was insane on account of her conduct and conversation at that interview. About a month afterward he had a similar conversation; her talk was the same, and that corroborated his opinion previously formed. In the year she called upon him at the Cafe Zinkand on Market street and spent an hour at a time talking with him on the same topic. She asked him if he did not know that Scott and Ball kept a harem at the Hotel Grosvenor on Sutter street, but the witness did not know anything of the kind. Witness had known Mr. Scott for about twelve years. When he first met Mrs. Scott her husband took him up to see her, saying that he wanted to make him acquainted with her. After a few moments, Scott excused himself and left witness and Mrs. Scott alone in the conservatory. On the second occasion she met Uhlhorn on the street one day and invited him to dinner, and he went the next day. Scott was not present on that occasion. She said that she expected Scott to dinner but he did not come. On an occasion about three months subsequent Scott invited Uhlhorn to dinner at his house and he went and they had dinner. Everything was agreeable at the table. Afterward they went into the parlor. Mr. Scott went upstairs and she and Uhlhorn conversed for about ten minutes. She was harping on the subject of her husband's assumed escapades and his running after women with Ball. After Mr. Scott came into the parlor he remained a few minutes and they then left the house. After the conversation the first time witness spoke to Scott saying it was strange his wife should

mention such matters to him the first time they met. Witness chaffed him a little about his running with women and he said that was all nonsense. Witness did not repeat to him what she said about the insane asylum, as he considered it was too delicate. In 1893 she invited him to go down to the ranch with Scott, as she thought it would do them both good to have a little outing. He accepted the invitation, and went down with him. Decedent wanted him to write for her a detailed description of the ranch in a letter and he did so. She paid a visit to the ranch while he and Scott were staying there, saying she wanted to see what the men were doing— having a good time, running around with women. This was the general trend of her talk, and she did not seem to have any respect for herself or anyone else in her manner of talk. Mr. Uhlhorn wrote a detailed description of the ranch for her in or about October, 1897, and gave it to her, and she seemed satisfied with it.

William Warwick worked for a while for Mrs. Scott in the year 1897. He went to seek employment in response to an advertisement for men at a vineyard. He first met her about September 15th, 1897. He heard that she had a vineyard at Mountain View and he went there to see if he could obtain a job. She told him that she did not have work in the vineyard but that she could give him work watching Mr. Scott. Warwick accepted the situation and entered upon the duty. He went on his trail and followed him about from that day, September 15th, until about the 6th or 7th of October, 1897, without detecting in him any impropriety or discovering him visiting any place of doubtful repute. The witness followed him all around San Francisco every day that Mr. Scott was in town, kept constantly in his wake all the time. Left the house every morning that he did and took the same car and returned in the evening when he did; wherever Scott went Warwick pursued. He did this at her request. She told him she wanted to catch Scott going with Mrs. Meily particularly. She instructed him to keep his eye on Scott and watch whithersoever he went and report results to her. She wanted to catch him with a woman so that she could take down the bed and move his trunk for him. She said that

Scott was of illegitimate extraction, using a vulgar epithet to describe his immediate female ancestor. She kept the witness running around after him, but as he found nothing unbecoming a gentleman in Mr. Scott's conduct he quit the pursuit and relinquished the employment.

John A. O'Dea is a plumber and a resident of San Francisco for nearly forty years. He knew Mrs. Scott from January 12, 1892, when he went to do some work for her and continued the acquaintance for the balance of her life. Had many conversations with her on topics other than business. She would insist on talking of her domestic affairs when the witness wanted to talk business and he strove by evasive answers to avoid such talk, but she persisted until he managed to excuse himself and left her. Her language was usually very profane and vulgar. She was very violent in her speech and manner at all times. His first experience was when he went there in response to a message through her coachman, and when he reached the house he was met with a volley of violent vulgarity, much to his amazement. With a torrent of torrid expletives she assailed his ears in so fierce a manner as to cause him to make a hasty retreat because of the linguistic bombardment, which was a novel experience to him—so much so that he declined to stay or return, but was induced to do so by the coachman, who assured him that that was only her customary way of expressing her emotions, that she spoke thus strongly on all occasions. The witness so found in his subsequent dealings with her. She would curse and swear and indulge in vulgar remarks to an extent and with a variety previously unknown to him. She always paid her plumbing bills. The last job he did for her was in 1896. She was not extraordinarily acute in her dealings.

Mrs. Gerrish heard Mrs. Scott say she could not keep her servants on account of the familiarity of Scott with them, and that her husband was running with other women, Mrs. Meily being one of them.

To Edward Lewis Brown decedent expressed herself that Scott was unfaithful to her and that he was no husband to her.

Mrs. Scott complained to Nellie Swall that Scott was running with other women and that he was trying to put her into an insane asylum.

To Charles E. Elliot decedent said that she could not keep a woman in the house without Scott's trying to get in bed with her. This was when Elliot advised her to have a companion.

Decedent told Amanda Johnson that Ball and Scott were going up to the Napa Insane Asylum to pick out a room for her.

To Sumner C. Murray she said that her husband was running around with "chippies," and to Wealthy Wormell she said that Mr. Scott was running around with other women.

When Mrs. Putman went to Mrs. Scott's the latter told her on the first day that Scott had improper relations with servant girls. She also mentioned a relative of Mr. Collins and said that Mrs. Paisley and Mr. Scott were conniving to do away with her. Mrs. Putman did not know exactly how, but the tale of Mrs. Scott was to the effect that she thought they were in common against her. Mrs. Putman had some grievance against Mrs. Meily on account of some stories that were repeated as coming from her, and thought she would be justified in retaliating by retailing some account of Mr. Scott's visit to Mrs. Meily, and she went and saw Mrs. Scott and began telling her about Mr. Scott visiting Mrs. Meily. Mrs. Scott said she knew that already and told the witness that she had made a visit there and was confident that Mr. Scott was with Mrs. Meily on that occasion. She told the witness that Mr. Scott had at one time tried to put her in an insane asylum.

Adolph Herman Grossman says that Mrs. Scott did sometimes complain of Mr. Scott going with women, but she did not speak of any particular woman.

Mrs. Mary J. Larmer says that Mrs. Scott was very vulgar and profane in her conversation, cursed and swore, and was violent.

Charles August Armstrong heard her swear on occasions. He was a cooper and did cooperage for her. Mrs. Scott did her business on strictly business principles, and whatever

engagements she made she kept to the letter. She said she had to attend to all the business herself as she had no one to do it for her, as her husband did not seem disposed or able to assist her. If Armstrong and Mrs. Scott had a disagreement about the price of her work she would swear at times at his propositions, but he would not mind it, because it was her way, and he thought it was a sane act for her to swear at him.

From these particulars of evidence counsel for contestant deduces proof of delusions sufficient to overthrow the will as an offspring of a mind diseased. Mr. Estee claims that there is here a perfect concatenation of circumstances, conduct, and conversation. No one link may suffice, but the chain is perfectly joined in all its parts. He claims to have shown that there was no foundation, howsoever slight, for her suspicion in any of the particulars specified, not a jot or tittle, not an iota of evidence to sustain the suspicion of the infidelity of Scott or the unchastity of the venerable sister in law or the niece of the decedent. The idea of either of these ladies being intimate with Scott was too absurd to be entertained by a normal mind. She knew that she had no proof of such a fact and with the cunning of insanity endeavored to fabricate proofs of his infidelity by trying to induce others for money to subscribe to statements incriminating him, but she did not succeed, because there was no proof possible and those whom she tempted were unpurchasable for such a purpose.

All this is stated in the strongest manner for contestant: but were her suspicions of Scott founded on a fixed belief? Was there nothing to induce belief in her mind, no scintilla on which to base suspicion—a very meager item, even—which would warrant her in concluding that he was unfaithful? There was something in the incident in the hugging of a servant girl at the fireplace or grate in the parlor which was related in the testimony of Carl Anderson, when upon her approach the girl repulsed Scott and he escaped through the window into the conservatory and the girl explained that he was only pushing her; this little incident is significant and might easily induce a jealous woman to suspect the constancy of her husband and to believe that he was in the habit

of being unduly familiar with the female domestics in her household. Her suspicions may have been unjust and her inferences too general, but that was merely an error of logic and not an evidence of insanity or of insane delusion. She had a right to infer however erroneously or from inadequate premises to a universal conclusion, for false logic or faulty ratiocination is far from the manifestation of insanity, so long as the process is formally correct, not incoherent nor inconsequential. Her suspicions or apprehensions that he and others were contemplating sending her to an insane asylum or poisoning her may have been unfounded in fact and yet have some germ sufficient to develop and fructify in her mind a rational fear that her life or liberty was or would be in peril from that source.

Mrs. Scott may have reasoned in her mind, however faultily, that some one meditated terminating her existence in some furtive manner. It is not hard to conjecture how she may have sat down and wrought out a theory of poisoning; her consciousness that her death was regarded as a consummation devoutly to be wished for by those who would expect to profit by her decease; no regrets in such a case except for the undue protraction of the period anterior to the inevitable event; but did she say that he premeditated poisoning her with real belief in it, or was it merely her habit of speaking in an exaggerated vein, characteristic of persons of more or less coarse cultivation? What is there in this testimony as to her suspicions of poisoning? If she really believed that she was in danger of being poisoned, she would not be apt to allow the attempt to be successful but would quickly rid herself of the presence of the designer. A woman of her resolute will would not hesitate to act at once and thus end the opportunity of the nefarious plotter. This testimony is colored and its importance magnified as such points are apt to be by those interested in presenting the features that for their purpose seem salient; but a fear of poisoning is not unreasonable where elderly persons of wealth are aware that their juniors are expectant of their demise. The instances are not few where such hastening of the exit of wives and others is accomplished, and it is not unnatural or irrational in persons

situated as was this decedent to apprehend that impatient expectants might so act.

It is not necessary to accuse the contestant of an intent to assassinate his wife by poison or otherwise, for it may be conceded that there is nothing to justify a suspicion or to warrant an insinuation of such a design, and that he is the mildest mannered man that ever entered the circuit of the clientele of counsel, but that he contemplated her earthly exit in the order of nature with some sense of satisfaction and prospect of relief is shown by the deposition of Charles E. Elliot, a venerable gentleman of nearly four score years, cousin of the decedent, who saw her at her house in San Francisco in the latter part of March, 1896, where he met her husband, the contestant. He had no conversation with him then and there, but did have a talk with him about that time at Mrs. Scott's vineyard, called the "Pebble Side Ranch," regarding the relations between himself and wife. As near as deponent could remember, Scott said his wife was crazy or insane; that she was very mean; that she gave him but very little money; that she treated his sons badly; that she was vulgar and had no religious principles, was very jealous, and in short he said about everything he could that was bad concerning her. Elliot said to him, "Why do you live with her, if she is so bad as you say?" Scott answered that he was going to hold on; that she would die very soon and that his lawyer had told him that she could not make a will that would stand, and Mr. Scott said to the deponent on that occasion, "If she don't make a will to suit me, I shall break it." Most of the conversations deponent had with decedent occurred when they were driving on several occasions early in April, 1886. She spoke about Mr. Scott and how she was disappointed in him; no help to her; no business capacity; complete failure; she had to do all details herself. In the opinion of Elliot she was level-headed, smart—a woman of sound mind.

It is argued that she had a fixed belief in nonexistent facts without any atom of evidence to support it, out of which it was impossible to reason her and that her mind was infected by this insane delusion and no argument could avail for its

disinfection; but when her physical condition is considered, we may take into account the opinion of Doctor Levi Cooper Lane, given in answer to the questions propounded in cross-examination by counsel for contestant:

Dr. Lane said that in case of a person, described as in the question presented, who had stomach troubles and female difficulties, who mistakenly believed she was being poisoned, and who almost daily insisted on her relatives tasting her food before she would touch it, when it did not poison them, and she saw that it did not have that effect, and she yet still maintained that her food was being poisoned, and that this continued for a number of years, with her surroundings and what she told the doctor, if she did not entertain such a suspicion, she would have been insane; her suspicions would not be evidence of insanity in view of all the circumstances; if there were no truth in the statements there might possibly be evidence of some incoherence of intellect. A person suffering from stomach trouble is almost necessarily irritable and may lose temper and swear and cut up generally and break dishes, destroy bric-a-brac, and play havoc with furniture, and yet be of sound mind. The doctor had known certainly of one occasion where one of the most intelligent men in this city, as he was regarded in his lifetime, behaved in such a manner, smashing chinaware and the like; he was sane; he lived a long time after this incident and he was regarded as an intelligent man. Dr. Lane spoke from his knowledge of insanity based upon long and extensive observation.

It may be conceded that she at times feared poison, but if it were a delusion, in the circumstances of this issue, it must have been continuous and persistent and operative upon the volitional capacity; otherwise it is not to be permitted to invalidate the testamentary act: Estate of Redfield, 116 Cal. 637, 48 Pac. 794.

When suffering from the chronic condition of her stomach, she may have imagined or believed that her food had been tampered with, but her mistaken belief would not, as matter of law, amount to an insane delusion: Estate of Carpenter, 94 Cal. 407, 29 Pac. 1101.

Unfounded and unreasonable suspicions are not insanity: Will of Cole, 49 Wis. 181, 5 N. W. 346.

The deceased suffering from her stomach trouble was at times peevish and petulant and sometimes suspicious even of her best friends and intimated fears of poisoning, but never acted on such apprehensions, thus showing that she had no fixed delusions thereon. She was a naturally suspicious person and showed this characteristic in the lifetime of her first husband, whom she undoubtedly loved. She left his home on one occasion for several weeks on account of suspicion of the fidelity of Collins, but he courted her with a lover's assiduity, and, induced by aroused affection and his amorous allurements, she returned to bed and board and there remained until he died and in token of his love and devotion left her almost his entire fortune, which constitutes the foundation and bulk of the wealth in this estate.

For five years she remained constant to his endeared memory. During that period of viduity the characteristics and peculiarities adverted to continued in manifestation; indeed these attributes were aggravated by her isolated condition. She was alone without associates or congenial companions; her husband and his friends had gone out of her life and she naturally sought a substitute and successor.

She told Dr. Lane that, after the death of Mr. Collins, she had a great deal of care and trouble with the management of her property, and she had been advised by some of her friends to marry and get somebody to assist in her affairs. She had adopted this advice and had accepted Mr. Scott as her spouse, and had assumed that he possessed the regular business qualifications to make an efficient auxiliary or to act as manager of her property, but she soon discovered that he was destitute of ability to aid her to any degree or in any manner. She found, in fact, as she said to Dr. Lane, that his chief object and main design was to secure possession of her property and that his purpose was entirely mercenary and selfish, and not any benefit to herself. She was not willing to allow him to accomplish his object in this regard and so her domestic life was encompassed by unhappiness. She was very unhappy at his conduct. In reference to

making a will she solicited Dr. Lane's advice as to what measures of precaution or circumspection she could adopt against any assault upon its stability or legal integrity, and he advised her to select some two or three gentlemen of pronounced professional character and standing in their specialty, who would be conceded experts in their department of medical jurisprudence, to decide the question of her mental status as to sanity, or at least to be prepared to testify in the event of its ever becoming a practical issue in any litigated controversy in court. Dr. Lane suggested in this connection certain names—Dr. Clark of Stockton, Dr. Gardner of Napa, and one or two others. In their conversations about the testamentary disposition of her property, the doctor said to her, "Mrs. Scott, you have a great deal of property; you ought to give some to charity." She had been talking about giving it to Mr. Collins' relatives and her own. She replied that she had a great number of relatives and she wanted to give her property so it would help those that were in need. Dr. Lane said to her that she ought to give something to charity. "Well," she answered to this suggestion, "I have enough poor relations for that purpose and I don't propose to give anything in that way." She visited the doctor a number of times on the subject of her sanity until it finally became tiresome. During the years 1896 and 1897 he told her that he was tired of the topic, and he summed up the situation by saying she was as smart as any woman he ever saw. She called to see Dr. Lane several times about the will and about her property. He knew nothing of the facts except as she told him—nothing personally about her domestic affairs or her household. From what Dr. Lane observed of her and learned from her, he considered her to be perfectly sane— entirely sound in mind. He had known her for many years, when she was Mrs. Collins, and in the lifetime of her first husband, and during the last two years of her life she visited him at his office and he visited her at her residence. He was not attending her then as a physician. She wanted to make a will that would stand in law, as she had been threatened that whatever will she made would be broken by her husband, Mr. Scott. She said that he had made such a threat, and

in these conversations she talked to Dr. Lane about her property. If this woman assumed that people were trying to put her in an insane asylum without any iota of basis for her assumption, and continued for many years to indulge this belief, still, in the circumstances of this case, she might be merely the victim of erroneous inference and be perfectly sane. It might or might not be symptomatic of insanity; the diagnosis would be dependent upon the entire congeries of causes or summation of symptoms. If she accused her husband falsely of holding improper relations with her servants, black and white, with her near relatives, very old women, it would seem that she was very jealous; it would not be evidence of insanity. She might forget herself temporarily, but that would not be insanity, even though her husband had given no reason for her jealous suspicion. Dr. Lane should say, regardless of the reason or want of reason, while she might be irresponsible for the moment she would not be insane, she had simply a very jealous temperament. If in the presence of some persons she pointed out of her window on the` lawn and said, "There's my husband and so and so," naming a third person on the lawn with him, when there was no one at all there, it would be a temporary delusion. If she pointed on the carpet in her own room to persons who were present and said, "There is Scott with so and so," naming a certain woman, "engaged in sexual intercourse," or tantamount words, when there was no such spectacle nor any person there, it would to the doctor import the offspring of an inordinately jealous mind; it would be an hallucination; the mind not absolutely normal; it would be a deviation from her ordinary and normal condition, but be restricted to that occasion.

Consider her circumstances: She was inordinately jealous, even in the lifetime of her first husband, of whom she was very fond, and who was a man after his kind, engaged in an occupation that was fraught with temptations to indulgence in liquor and developed in inducements to pleasures of the palate. It is not surprising that he drank occasionally or often to excess; he did drink and at times became intoxicated and then would express himself in indelicate terms. His

wife acquired these habits and took on the roughness and grossness which were the accompaniments of the times and places. She was a woman of strong characteristics, strong beliefs, strong sentiments, strong speech, and strong purposes, and indifferent to the conventionalities of the society of the later and present era of settled social form and orthodox observances. It might have been different with her in a more conservative community, although it is not fair to generalize from the small premise of her special surroundings that the society of San Francisco was crude and unrefined, for we know that from a very early date this city contained its fair proportion of as good and true women as ever adorned any community. It is historical, and the court has a right to note it, that in the early summer months of 1849 family homes began to appear in every direction in San Francisco, and by the fall of that year they could be said to be numerous, and from that time forward they steadily increased, and a year afterward they were a leading feature of the young city, and for the next few years not even twenty per cent of the population could be subjected to criticism from the severest censors. It is true that the obnoxious elements made themselves so conspicuous and kept so constantly in evidence and on parade that one just arriving in the city might imbibe the impression that the proportion was much larger, but that this ratio is right may be ascertained by authentic annals, such as a work of the late Hon. William F. White, entitled "A Picture of Pioneer Times in California," which is valuable for its accurate data and details, verified by a writer who with his family, one of whom is now a senator of the United States, formed a part of this community; but nevertheless it does not appear that the decedent cultivated this element. Her associations were mainly such as centered and converged and crystallized in that class which found its social circle and status and ethical standard and moral atmosphere in the saloon, which however reputably conducted, was not naturally nice or choice in its conventional criteria of the proprieties of conversation or conduct. In other circumstances a more pleasing portrait might have been presented of the heroine of this contest, but such as she was we have her here; her

stomach was weak and sensitive until this condition became chronic, presenting symptoms not ordinarily understood by the common mind; her diet delicate, mostly mush, crackers, juice of beefsteak, and a very little bread; her disposition somewhat affected by her dyspepsia; prone to anger, in the ebullitions of which she breaks dishes and destroys bric-a-brac, and makes life very tropical for her intimates, employees, and dependents generally; while so suffering irritable and disagreeable, otherwise a pleasant person.

In all these circumstances it is not remarkable that she was troubled with megrims and that her slumbers were broken by nightmare, when she had an hallucination that a murder had been committed in the hall of her house, which incident may have resulted from her oversizing her drams of whisky, for, according to Mrs. Meily, she was an habitual and hard drinker of alcohol during her latter years, and an extra dose of this sort of poison may have been the cause of this nocturnal aberration. Mrs. Meily testified that she had seen her aunt Angelia several times under the influence of liquor, and it may have been that upon this occasion, when his stepmother told Wesley Scott that some one was being murdered in the hallway, when no such transaction was in progress, that her aspect was so dazed and distraught as to suggest that the whisky had been exceptionally potent. The distemper of drink may have wrought this transient condition of her nerves and temporarily disturbed the diapason of her wits.

She was at times troubled with insomnia, as was natural with one who was afflicted with an intestinal disease, and then momentarily, like Lady Macbeth, "she was troubled with thick-coming fancies that kept her from her rest," but her mind was not necessarily diseased.

She was a very nervous and unhappy woman, and what did her husband do to alleviate her distress? She was living unhappily with him and he was tolerating her for the sake of the future when he hoped to possess and enjoy her fortune. Why did she marry Scott? Was it for love, or was it merely a commercial union? Was it solely that she might have a domestic partner who could manage her affairs, protect her property, and relieve her of the strain of business

cares? The truth seems to be that her motive was composite, and the reasons she gave from time to time are reconcilable to this theory. She needed some one as an affectionate associate in married life—some one to supply the love element in her nature and to attend to her material interests at the same time, and when she came in contact with Scott she imagined that she had attracted her affinity in both regards, but this may have been an insane delusion, for a short experience caused her to rue the day she married him; they were married but not mated, and hence infelicity. Two motives entered as ingredients in her choice of him, only one in his selection of her; his was a merely mercenary motive. She craved for something more than money; she believed that Scott could fill the aching void in her heart; that she could find in him a suitable successor to her deceased spouse; but it was a bitter disappointment in every respect. The contract so far as sentiment went was unilateral; she wanted a conjugal mate who would relieve her head from business cares and occupy the vacant space in her heart and the vacant chair at the table once filled by Collins, but Scott married her for money; his motive was mercenary and marital misery followed from his incompatibility and incapacity. In true love and as a business union this marriage was a failure. She was jealous, and in the philosophy of love it is said that this malign sentiment is its bitter fruit, and it survives youth, especially in women. But it was different with him; he was not jealous, for he loved her not, although he had once listened to her, pretending to reciprocate, when she said she loved him, for

> "When a woman loves a man
> The man must hear her, though he love her not."

Why did she love him? Is human love the growth of human will? These are questions that only a woman can answer, and the age is not yet so far advanced that she can make response in judicial decision.

> "It is not virtue, wisdom, valour, wit,
> Strength, comeliness of shape, or amplest merit
> That woman's love can win, or long inherit
> But what it is, hard to say, harder to hit."

It is enough to say that there is evidence in this record that she did love him, but the love was not mutual and did not bring life's discords into perfect tune. Her passion was unrequited and she was conscious that he did not return in sincerity the sentiment that he professed before marriage and at the altar. Jealousy is said to be the offspring of love, and this was decedent's only child. She was enamored of Scott and in her passion was constantly thinking and talking of him, for it is true, as George Eliot tells us, that jealousy can no more lose sight of its object than love.

In regard to him it may be said that for the purpose of passion it would not be natural to seek satisfaction in the embraces of antiquity, and it is fair to assume that her complaint that he was not a husband to her was founded on fact, although he testified that he was a husband to her up to the day of her death, with all that that implies, but this statement is antagonized by her declarations and by circumstances that render its truth improbable. It may be conceded that her suspicions of the fidelity of contestant persisted in, as it is claimed they were, without evidence to support them and against all reasonable probabilities of truth have the semblance of insane delusion. Yet it is not necessarily so.

Observation teaches us that there is a very large class of people, whose sanity is undoubted, who are unduly jealous or suspicious of others, and especially of those closely connected with them, and who upon the most trivial, even whimsical, grounds will wrongfully impute the worst motives and conduct to those in whom they ought to confide. This insanity, which is developed in a great variety of forms, is altogether too common, and too many persons confessedly sane are to a greater or less degree afflicted with it, to justify us in saying that because the deceased was so afflicted she was insane, or the victim of insane delusion. The line between unfounded and unreasonable suspicions of a sane mind (for doubtless there are such) and insane delusions is sometimes quite indistinct and difficult to be defined. However, the legal presumption is in favor of sanity, and on the issue of sanity or insanity the burden is upon him who asserts insanity to prove it. Hence in a doubtful case,

unless there appears a preponderance of proof of mental unsoundness, the issue should be found the other way: Will of Cole, 49 Wis. 181, 5 N. W. 346.

She was suspicious of his constancy. Suspicion is the imagination of the existence of something, especially something wrong, without proof, or with but slight proof; it is an impression in the mind which has not resulted in a conviction. It is synonymous with doubt, distrust, or mistrust—the mind is in an unsettled condition. Suspicion existing, slight evidence might produce a rational ultimate conviction or conclusion; this without evidence however slight, would be a delusion. Is there evidence, however slight? This is the test. The suspicion may be illogical or preposterous, but it is not, therefore, evidence of insanity: Clapp v. Fullerton, 34 N. Y. 190, 90 Am. Dec. 681.

A most unwilling witness was Mrs. Louisa M. Putman, who was very reluctant to testify and who said that her husband, Dr. Putman, had been greatly opposed to her coming forward in that capacity. She came, however under constraint, and under the subpoena of proponents, being served with great difficulty, and here is her story in short meter:

Mrs. Putman first saw Mr. Scott at Mrs. Meily's house, 730 Union street, between Powell and Mason, in or about January 1895, at the bedside of Mrs. Meily's sick son, who was the husband of the witness and who died in January, 1895, and was buried from that house. She could not say definitely how often she saw Mr. Scott in 1895 and 1896, but it was several times. He usually called in the morning about 10 or 11 o'clock, on week days; sometimes in the afternoon; he would remain sometimes fifteen or twenty minutes or perhaps half an hour, sometimes an hour. Mrs. Putman knew the decedent and visited her shortly before she died. Mr. and Mrs. Scott were there several times during the illness of the husband of the witness. Mrs. Scott introduced Mr. Scott to the witness there. He always conducted himself with propriety in the presence of the witness. Witness was not residing with Mrs. Meily but would stay a week or so at a time when she was not otherwise occupied at work. If witness happened to be unemployed at her occupation

she would pay Mrs. Meily a short visit, merely that and nothing more. When employed witness was engaged at dressmaking. She could not say definitely how long she spent at a time at Mrs. Meily's but was there, she thought, in the months of January, February, or March, 1896. Two months was the longest period of time she was in that house continuously after she was married to the son of Mrs. Meily, but she could not name the two months. Sometimes she would call of an afternoon. Witness was nursing at the time and it would depend when she would obtain relief— sometimes in the forenoon and other times in the afternoon. While she was on friendly terms whenever she had a little time off she visited Mrs. Meily. She first saw Mrs. Scott at her house in August, 1897. No one told her to go but she guessed she was moved by a malicious feeling on her part toward Mrs. Meily, against whom she had a grievance. Witness had heard that Mrs. Meily had spoken unkindly of her and she felt unfriendly about it. They never had any words, no quarrel, but some stories were repeated as coming from Mrs. Meily that annoyed witness, so she thought she would be justified in retaliating by retailing some account of Mr. Scott's visits to Mrs. Meily. She first went to Mrs. Garcia, who refused to tell Mrs. Scott; told witness to tell her herself; witness then went and saw Mrs. Scott and began telling her about Mr. Scott visiting Mrs. Meily. Mrs. Scott said she knew that already and told witness that she would give her $500 if she would put in writing charges against Mr. Scott that would incriminate him with Mrs. Meily. Witness could not remember all that Mrs. Scott wanted on the paper which she desired her to sign. It was not exactly the writing of the witness, who never made any remark that improper relations existed between Mr. Scott and Mrs. Meily, or that she ever saw anything of the kind. After the first visit Mrs. Scott began sending the housekeeper, Mrs. Burnham, down to ask the witness to call and see her. She visited Mrs. Scott again after the August visit in response to a request conveyed to her in letters. The witness wrote a letter to Mrs. Scott about the first part of September, 1897, in the following words:

"You told me you would say nothing that would bring me into family affairs, in fact would not mention my name. Now I am willing to face anything I say, but to be mixed up in family troubles, I beg you will refrain from asking me to do such. What I told you was for your own personal good. . . . . Mr. Scott said Mrs. Meily was crying all the time over it. How did he know it? If you did not give him the address here, who did? Perhaps Mrs. Meily?"

That letter speaks of Scott; he called on witness and said that Mrs. Garcia has told his wife a great deal or that Mrs. Garcia had said to him that witness had told or said a great many things about him, and he asked witness if she had anything against him. She said she had not. He was a perfect stranger to her in the first place, and he told her that his wife and he had some trouble and that she had accused him of acts that were purely imaginative, simply what she herself thought, and remarks that the witness was supposed to have made with regard to improper relations, and witness denied that she ever said so; but there is the letter, and it speaks for itself. Mrs. Scott told the witness that she had been to Mrs. Meily's house twice in one day, that she could not get in and went away and came back again. she said that she knew Scott was inside because she felt something from within, the influence of his personality, magnetism, or something of that sort.

It is not necessary to inculpate the suspects in such a case; it is enough that there were circumstances in the association of the persons to impress the jealous mind, and the evidence of Mrs. Putman so reluctantly and cautiously educed, even were it but a feather's weight, shows that decedent had material for suspicion. There was at least slight evidence that her husband was visiting another lady clandestinely and surreptitiously, and that was enough to remove the stigma of insane delusion, although by no means sufficient to justify this court in concluding that her niece was guilty of misconduct. Mrs. Meily's entire innocence in intent and act is consistent with the ill-timed and indiscreet visits of Scott to her house, so far out of his direct course from his own home to his office.

No matter how tenuous these threads of testimony are, they are sufficient to support her suspicion. In regard to the caressing of the servant girl it was denied by Mr. Scott when on the witness-stand. In reference to the Meily matter Mrs. Burnham testifies that Mrs. Putman came to Mrs. Scott with a story about Mrs. Meily. Mrs. Meily testifies that Scott did visit her repeatedly, at her home, 730 Union street, on his way down town from Franklin and Sacramento street to his office in the Merchants' Exchange. It is only necessary to indicate these points of departure and terminus in his daily travel to illustrate at what inconvenience of time and circuitousness of route he paid these visits to her alone and in the absence of her husband. Mrs. Putman knew of these visits and testified that she went to Mrs. Scott with a story about Mrs. Meily for the purpose of maliciously injuring that lady, but whatever was her purpose or her grievance, she added fuel to the flame of jealousy already existing in the mind of Mrs. Scott, who was impressed by her tale. Still there was no ultimate conviction in her mind; she had doubts; and constantly sought information to resolve them. She employed detectives, who seemed to have deceived her and conveyed their stories to her husband, with whom they have been since on intimate terms. She offered rewards of proof of the facts; tried her own hand at detective work; visited Mrs. Meily to ascertain the truth; interviewed Mr. Scott's gentlemen friends to elicit information; and in many ways showed that she had no fixed belief of Scott's infidelity, and the statements on that subject which she made were mainly to Scott's particular friends and her servants who faithfully communicated them to him and have since reproduced them in evidence. William Warwick is a sample of those who practiced the system of espionage in her behalf. Mrs. Burnham is another who made a pretense of acting as a spy, disguising herself and deceiving her mistress, to save her situation. This lady naively confesses that she practiced deceit and duplicity and did not even make an attempt to act the part she pretended to play; but she failed to save her situation, leaving there on the 4th of December, 1897, and did not return to the service during the lifetime of decedent. Subsequently she did so return

and is now an inmate of the Scott mansion. In respect to this item of infidelity, it may be said that there being slight evidence to support suspicion there was no delusion; and there being no settled conviction, there is no delusion.

Was the expressed apprehension of the decedent that contestant had conspired to confine her in an asylum an insane delusion?

There is evidence ample in the record that Scott twitted her from time to time with being crazy, and said that he could break any will that she would make, and he is here now engaged in the execution of that threat. That he taunted her with his ability to set aside her will, as he could prove her insanity and that he nagged her on this point with the view of instilling into her mind some doubt of its soundness is established to the satisfaction of the court. Undoubtedly this worried and annoyed her, and it was but natural that she should entertain an apprehension that he and his close friends might conspire to that end. The testimony of Carl Anderson, the coachman, although denied stoutly by contestant, is circumstantially credible in respect to the conversation in the coupe; that they had a quarrel on the way out to the Cliff House, where Scott left and she returned alone in the vehicle driven by Anderson, is certainly true, and I can perceive no evidence of animus in this witness against contestant to justify me in rejecting his testimony. Anderson may himself have said, as is testified to by the impeaching witnesses, that she was "crazy" or "absent-minded," or he may merely have advised some of the persons employed by her or others not to mind her quick temper or swearing as she did not mean it, but that does not authorize the court to discard or discredit his entire statement. Mr. Ball, recalled to impeach this witness, testified that Carl Anderson said to him in his office on or about February 1, 1890, that Mrs. Scott was crazy. Anderson came to the office of Ball on some errand for Mr. Scott, who was absent at the moment. Ball asked Anderson, "How is the old lady?" and Anderson answered, "Just as crazy as ever." In this connection it may be worth while to allude again to Mr. Ball's evidence. Mr. Ball was present when the decedent was married to contestant, who had an office

with him at that time, dating back to 1884 or 1885. When Scott was east, Ball visited her two or three times a week and remained there from 6 or 7 to any hour up to 12 in the evening, and continued to visit her up to 1892, but did not remember being there in 1893. She visited Ball's office in 1892 and asked him if she looked crazy enough to be put into an insane asylum. "I thought perhaps it was one of her lucid intervals." In 1890 she said to Scott in the presence of Ball, "That E. W. wanted to look out or she would use a pistol on him." During Scott's absence in the east Ball was at her house twice a week for four months; her conversation was continually on the same topic and was very tedious and tiresome—indeed, became very monotonous. One time they had a drink together; they were in the dining-room and she went out of the room and brought the whisky in a small decanter. Sometimes he would go there and dine with her; other times he would go there immediately after taking his dinner, say about half-past seven in the evening, and on one occasion in the course of her conversation, doubtless after draining the decanter, Mr. Ball paints a vivid picture of an incident that occurred consequent upon a remark he made to her. "She instantly became like an enraged tigress—jumped up from the table. Her countenance changed, and she looked like a fiend. Her eyes hung out of her head, and she smashed the table, a marble-topped table and she said: Mr. Ball then recites the language of this fiend-like woman after she had jumped up in the manner of an enraged tigress and with her paw fractured the marble-topped table. Mr. Ball's delineation of this unfortunate victim of morbid delusion was realistic in the extreme. Her appearance, attitude, and action so artistically arranged in Mr. Ball's description portray one demoniacally possessed. Uhlhorn testifies that when he was introduced to Mrs. Scott by Mr. Scott in August, 1891, the first thing she said to him was that Mr. Scott and Mr. Ball were trying to railroad her to the insane asylum.

It is a curious fact if this woman were as crazy as they would make her out through all these years, from 1890 to her death in December, 1897, and if she had murderous designs, as some of them say, that they would care to visit

her or live with her or be under the same roof in such close
and constant intimacy with a dangerous lunatic.

Anderson testifies without appearance of bias, and on the
whole seems well disposed toward Scott, who, he says, was
quiet and good tempered, as a rule, although at times he
would provoke her. Scott is a superficially smooth, plausible
man, with a pleasing exterior, and understood his interest
sufficiently to curb such temper as he had, at times mani-
fested some spirit, when thrown off his guard; but Carl
Anderson does not appear to have any ill-will toward him,
and when he relates what occurred on the trip to the beach
and what he told Scott at the stable in answer to his inquiry
as to what she said, after Scott left the coupe at the Cliff,
there seems no sufficient ground to doubt it. Mr. Scott on
his recall denied the main feature of Carl's statement and
said "he was never in the habit of making a confidant of
servants," but it appears that the coachman was an old ser-
vant of eleven years' standing, and such servants are often
the voluntary or involuntary recipients of family confi-
dences. It is fair to infer from this and other statements
in the record that Scott did say what was imputed to him
and tormented her with insinuations as to her sanity. She
was thus led to believe that he desired to have her so
situated that he could enjoy the fortune for the sake of
which he married her, and that when he should be no longer
handicapped by her presence he would pursue the path of
pleasure unmolested so long as her wealth would be under
his control without interference from her. There was some
evidence then to support this belief, and it was, therefore,
not an insane delusion.

It is proper to note, without invidious reflection, that the
witnesses for the contestant may be placed in two categories:

1. The intimate and personal friends of the contestant,
E. W. Scott.

2. Persons who for a period were in the employ of the
testatrix, Mrs. Scott, and who failed to retain their situa-
tions, and who for one reason or other have been dissatisfied.

Among these in the first category we find Hammond, the
friend and office companion of contestant; Dyer, personal
friend introduced by Scott; Perkins, personal friend; Estella

Burnham, private seamstress, and now in the employ of con-
testant; Morton, the bookkeeper, personal friend introduced
by Scott; and Uhlhorn, another personal friend of contest-
ant.

In the second category, Catherine O'Connor, who was
employed in a sort of general capacity doing all that there
was to do and doing all the talking with Mrs. Scott, and did
more talking with her than anything else, and who from the
voluble manner in which she gave her testimony was quite
capable in that respect; Joseph Mortier, orchardist and wine-
maker of the vineyard; Ida Gustafson, Sena Cook, Ulrica
Anderson, house servants; Talman, the chicken-man; Mrs.
Mary J. Larmer, nurse in house of Mrs. Meily's mother;
Fred Bockwoldt, erstwhile foreman at the Scott ranch; Mrs.
Ella Joseph, colored domestic in the Scott mansion; Froe-
lich, the wine broker who had litigation with Mrs. Scott;
O'Dea, the plumber; and finally Elizabeth Jane Richards,
who worked for her from 1890 until the death of testatrix,
in December, 1897, and whose testimony can hardly be
treated with the traditional tongs, but as a specimen of her
feeling toward the deceased this charitable observation may
be culled from the record: "Mrs. Scott said that she would
be dead and stiff in hell by Christmas day. I guess she was."
This witness made this remark professing at the same time
to have been very friendly with the decedent. As a sample
of her reckless statements on the stand reference may be
made to her testimony that decedent employed and dis-
charged as many as three girls in a day, and that they would
not stay because her language and habits were so bad, and
that there was not food enough for them. When the court
called the attention of this witness to the fact that three
girls a day would be many in a month, she responded that
she did not think that decedent had so many in a month
but she had one every day in the month. This woman's
extraordinary nerve in voluntarily narrating incidents
from which even a degenerate masculine mind would revolt
was so abnormal as to shock every one within hearing and
to cause the counsel for contestant to suggest that if it were
to continue, the case had better proceed with closed doors;
yet she affected delicacy in reciting the remarks of dece-

dent, saying she could not explain all the language used. ''A man might do it; not a lady.'' Yet notwithstanding the brutish behavior and ineffable grossness of the decedent, from the first day to the last, this lady remained with her for eight years.

Mr. Estee, of counsel for contestant, in commenting on the mode of conducting trials of this kind, made some remarks, the substance of which the court has preserved, because of their general value. He said that the asperities generated in the course of controversy should cease when the time for argument arrives; then the heat of the trial being over the cool reason only should govern; the abuse of one attorney by another is not argument and can avail nothing before a court constituted to try a cause, nor is the abuse of witnesses serviceable in the illustration of the important issues in such a case. Most men and women are honest, women as a rule more so than men, but the intentions of most are upright and desirous of honest dealings. Some men make poor witnesses, most women show to poor advantage on the witness-stand, but that is not because they are not telling the truth but because they are so constituted that their feelings are enlisted and their sensibilities are superior to those of men and not so easily controlled. It is proverbial, therefore, that women are poor witnesses; so with old men, who seldom do well when under examination of counsel in court; they mean to testify truthfully, but because of age or sex are easily disturbed in their train of thought and current of connected discourse. Counsel therefore did not undertake to descant upon the duplicity or deceit or falsehood of witnesses whom he did not believe to be in any way guilty of perjury, but who by reason of feeling or age, or other natural accident of constitution, may have colored or exaggerated or innocently diminished or distorted the facts in their testimony. Counsel has the greatest respect for Dr. Lane personally and in his professional character, but thought his feelings dominated his evidence; as for Mrs. Richards, he did not think she was a good witness, but she was entitled to animadversions to no such extent as was indulged, and counsel for contestant knew her to be a good woman not-

withstanding the unpleasant tenor of her testimony, which, being the truth, she was bound to disclose.

The court is in perfect accord with the sentiments of the learned counsel, and if the lady whose testimony has been presented has been dealt with unfairly, she may abide by the record which will be the final test for all concerned.

Opposed to the witnesses enumerated are those for the proponents, whose character and standing are not challenged, save in some exceptional cases, such as poor Pontus Ahlstedt, whose prenomen provoked a pun, and Carl Anderson, whom counsel for contestant thought it not necessary to abuse because he was a poor, ignorant man who got mixed up in his memory and substituted imagination, as much as he had of it, for actual occurrences, and counsel thinks it is charity to Carl to say he was mistaken; but as to the others, they are let off lightly, with the suggestion that they are mere business acquaintances and not up to the standard of Uhlhorn, Dyer, Perkins, Richards, and the others already cited and quoted; but many of them had large opportunities to observe and belonged to an intelligent and discerning order of observers; if their testimony was of the negative kind, in some instances, it was of a high character and from persons not apt to be deceived or mistaken, and met the improbability of much of contestant's positive or affirmative evidence.

In connection with the witnesses for the contestant there are many circumstances of suspicion giving color to their testimony. Some of these suspicious circumstances may be mentioned; such as the method of introduction of Major Hammond, Mr. Scott's office companion; the peculiarities surrounding the sudden desire of Scott to introduce Uhlhorn leaving Uhlhorn alone with her; the dinner which followed at which Scott did not participate; after that the dinner at the invitation of Scott; the scene in the parlor when she was left alone again with Uhlhorn; the suggestion of Uhlhorn at his first visit that she was crazy; the line of real estate men introduced by Scott to sell her property, and the care and zeal with which they pursued their wealthy quarry; the frequent visits and the time they spent in the pursuit, notwithstanding their settled conviction at the very

outset that she was crazy and could not competently transact any business of importance; the fortunate circumstance of Annie Robinson going to the office to obtain a witness to an instrument; the chance meetings on the streets and on boats; the remarkable ability to discover and marshal servants of years gone by who had been dismissed from employment; many of these discarded domestics are brought in to testify to trivial transactions, inconsiderable incidents and segregated circumstances, designed to promote the purpose of contestant in traducing the memory of deceased and to expose her infirmities of temper and magnify her foibles into the dimensions of disease of mind, every atom of acerbity on her part and every ebullition of anger, no matter how evanescent, is exaggerated and accentuated as evidence of insanity.

The value of the evidence of business men and acquaintances acquired in commercial dealings has been favorably regarded by the courts in all cases of this character, and the persons here produced by proponents are certainly entitled to credit within the sphere of their observation. A brief résumé may here be given of the evidence adduced in favor of the sanity of the testatrix:

Edwin Lewis Brown was an accountant and bookkeeper for the decedent for some years after 1879. Brown used to go to her house at stated periods to make up the books. She was a shrewd and suspicious woman, distrustful to a degree. She was aggrieved apparently at her husband, Mr. Scott, and spoke of her suspicions of his fidelity to her. She said she married him because she loved him and she wanted some one to handle her affairs, and Scott was reported to her as a business man and was introduced as such. She said she did not think he reciprocated her affection, and she suspected he was not true to her, as he was no husband to her and she knew enough about men to know that this was because he was going with other women. She stated on more than one occasion that Mr. Scott had charged her with being crazy or said that she was crazy, and told her so to her face, and such remarks had a tendency to provoke and worry her; she was sane.

George Swall knew Mrs. Scott since 1885, and thought she was sane.

Mrs. Nellie Swall knew decedent all her own life and believed her to have been sane.

Gustave Messinger, a fire insurance agent, knew her for twenty-three years, and handled her insurance about three years prior to her death; saw her three or four times a year, and carried about $123,000 for her. She always selected her own companies, giving particular personal attention to the paying of premiums and the exacting of receipts, for she would not trust anyone to pay the premiums, not even this witness, and in his opinion, from her appearance and manner of doing business, she was rational.

Sumner C. Murray, a carpenter and builder for thirty years in San Francisco, knew the decedent and worked for her at least a dozen times in the two or three years before her death, always dealing with her personally. Her conduct and appearance was rational, and in his opinion she was of sound mind.

William H. Rhodes, engaged in the safe deposit department of the California Safe Deposit and Trust Company, knew decedent as a customer of that concern for two years. Had many conversations with her on her visits to that place, sometimes for a few minutes and sometimes for as much as half an hour at a time. Saw her once a month or once in two months; in his opinion Mrs. Scott was perfectly sound in mind.

Mrs. Olivette M. Folsom testifies that she has been married about ten years. Her mother in law died about two years ago of a stomach trouble. She had suffered several years prior to her death. The senior Mrs. Folsom came to this coast on the same steamer with Mrs. Scott and the friendship continued until death. Each had this similar chronic complaint and both had the same physician. They used to compare notes as to their symptoms. After the senior Mrs. Folsom's death Mrs. Scott used to visit the junior repeatedly, which visits were returned, and the young woman went to drive on a number of occasions with the elder one, and they talked habitually of the symptoms of Mrs. Folsom in her last illness. The mother in law of witness

had to be very careful in her diet in the last year of her life. Witness heard from them that her mother in law and Mrs. Scott came out to California together. She heard Mrs. Scott complaining of her stomach troubles; the two talked before her on the subject matter of their abdominal ailments. She never heard Mrs. Scott accuse anybody of attempting to poison her; never heard her use profane, vulgar, or obscene language or say or do anything unbeseeming a lady. She was perfectly sane. Witness gave as her reasons that she always conducted herself in a rational manner and talked sensibly, her conversation was the same as that of any other sane person. In all these conversations there was no suggestion made by Mrs. Scott that she had been poisoned, that she thought her trouble arose from poison, or anything whatever about poison.

Robert Frank Clark, in the insurance line for twenty years last past transacted some matters for and with decedent. She did business the same as anyone else. Clark saw her at her house, talked with her for as much as half an hour at a time. The conversation occurred in a little room off the hall, apparently a reception-room. Decedent may have talked about her properties in a general incidental way. She alluded to her physical infirmities, giving Clark to understand that she was possessed of a very sensitive stomach and was of the dyspeptic order. Witness thought she was very suspicious in business matters, a nervous woman. She never told Clark that she feared being poisoned. He never saw her excited. She was emphatically sane. Clark gave as reasons for his opinion that she conducted her business with scrupulous care in regard to data and details, very exact in money matters. She never talked to him about her domestic affairs. The transactions of witness with her were from November, 1886, to November, 1893.

Amanda Johnson was employed by Mrs. Scott for nine months in 1893. Decedent was delicate, just sick. She did not tell witness what was the matter. She took massage treatment while witness was there, who used to have to stay in the room during the time. While the rubbing was going on decedent would have some covering over her. Never heard her say that she was in danger of being poisoned.

She was not easy to get along with. She used to become angry sometimes. She said she had too much business to attend to; that she thought Scott did not care for her because she was too old; that he drank sometimes; that they would try to break her will when she was dead by trying to prove that she was crazy, that Scott would try and do this. Once when the witness was with her passing in sight of an insane asylum, decedent pointed in that direction and said that Ball and her husband had picked out a room in that institution for her. In the opinion of the witness Mrs. Scott was sane.

George A. Folsom came out to this coast on the steamer with decedent, 1857, and afterward the acquaintance continued here. He saw her three or four times after her marriage to Mr. Scott in 1889; the last time in November, 1897. She was perfectly sane.

Joseph Henry Marshall, a resident for thirty years of this city, a salesman for the Dunham-Carrigan Company, dealers in hardware, knew Mrs. Scott as a customer of that firm years ago. Her transactions with the witness were purely on business and continued for a period of six years. The acquaintance was begun in the store where witness was employed. She came about once in two or three months, perhaps about thirty times in all. She was very bright in making purchases, in looking after cash discounts. She came about once in three months. Marshall thought she was perfectly sound in mind and very bright.

James S. Bock, floor superintendent of Newman & Levinson, on Kearny street, for twelve years, knew decedent as a customer since before she married Scott and had many conversations with her on matters connected with her purchases. She was very reserved and aristocratic in her demeanor and mannerisms. She was always dressed up to date, very particular as to appointments of apparel and a close and exact buyer, a hard customer to please, with an excellent knowledge of fabrics and a good judgment user in the selection of materials. She always wanted the latest styles and she was a good judges of modes. Had no conversation with her except in the line of his calling. She was sane.

John M. Ver Mehr deposed that he was an assistant accountant at the California Safe Deposit Company, and knew the decedent as a customer; saw her many times but had no considerable conversation with her, but so far as he could judge Mrs. Scott was perfectly sane.

John J. Doyle knew Mrs. Scott since 1888 and had business with her down to November, 1896. Witness has been engaged since 1881 in selling the product of the vineyard Las Palmas, which is by the road three miles and a half from the Scott ranch, the Pebbleside. She often came to his office in the Safe Deposit Building to consult about the price of wine and other cognate matters. Had no conversations with her except on business. She impressed him as an intelligent and shrewd woman of business and had a good knowledge of the market generally. She was thoroughly sane; conversant with the condition of the market and connected in her discourse, discussed the future of the market and reasoned well upon the probabilities of prices.

Samuel G. Murphy, president First National Bank, knew Mrs. Scott since January, 1896, and she was sane beyond any question.

Miss Clara L. Wilson knew Mrs. Scott twenty years. Had seen her often in the last ten or twelve years. When she was out riding in this city she frequently stopped at the house of the witness. She used to talk to the father of witness, Ezekiel Wilson, about her vineyard and some property she had on Point Lobos Avenue and some horses. Witness last saw decedent in 1897, and in her opinion Mrs. Scott was perfectly sane.

Thomas Brown, cashier of the Bank of California, knew Mrs. Scott as a customer of that institution in which her account was closed prior to her death. She was sane. His opinion was based on observation of her in transactions with the bank. He had no other means of judging of her mental condition.

William Plageman, engaged in the milling business in this city, knew Mrs. Scott, and had conversations with her on matters of business. In his opinion she was sane, and the witness saw nothing in her action or talk to indicate insanity.

Ezekiel Wilson, nearly eighty-two years of age, and a resident of San Francisco for forty-eight years, and very well known during all that time, knew the decedent intimately for twenty-five years. Never heard her swear or use unseemly language. She was always a lady. She talked about her health, stomach trouble, dyspepsia, had to use care in her diet. She was a very bright, intelligent, first-class business woman, rational and shrewd in her ideas. She was sane and he never thought otherwise. Her conversation and conduct showed sanity.

C. A. Armstrong, already alluded to elsewhere, thought she was sane.

As to the habits of contestant it is not open to doubt upon the evidence that he sometimes took a drop too much. In his own testimony he says that for two or three years when he was selling wine and associating with drinking men he may have drank a shade too much, but he was never under the influence of liquor to an inordinate extent; he was always able to take care of himself, and did not need aid of any person to assist him home or otherwise. The testimony of Berry, Coyle, and Kelly, hackdrivers; Wallace, car conductor, and farmer Ahlstedt, is hardly overcome by this general denial of contestant. It is not surprising that this gentleman at times was tempted beyond his powers of resistance, for such a dragon as he makes out decedent would drive a regiment of teetotalers to drink. "The man had a shrew for a wife and there could be no quiet in the house with her." This phase of the case may be passed without further remark.

In regard to the evolution of these testamentary instruments we must consider at some length the evidence of those immediately concerned in and about the act of execution.

Philip G. Galpin began his practice in San Francisco as early as 1858, and has been identified with his profession in this place since that time, and for more than twenty years continuously has resided in this city, engaged in active and extensive legal business. Mrs. Angelia R. Scott came to his office in relation to the drawing of the document dated October 22, 1897, to which his name is subscribed as a witness in association with Jacob C. Johnson and Edward H. Horton.

He made a draft from the instructions given to him by her. She gave the details of the devises and legacies. He first made her acquaintance after she married Scott—to the best of his memory a short time before the making of the will in 1891. The witness identified his signature on the instrument dated October 22, 1897, and also the signatures of the other subscribing witnesses, Jacob C. Johnson and Edward H. Horton, just above his own, and stated that he saw the testatrix write her name in their presence. At that time the decedent said that she published and declared it for her last will and testament. From the time witness first knew Mrs. Scott she came occasionally to his office, during the last few years a great many times. He prepared the paper of October 22d, at her direction.

Mr. Reuben H. Lloyd was also consulted. Mr. Galpin never had any conversation with Mrs. Garcia in connection with the drafting of the codicil. Neither she nor Mrs. Gerrish was ever present at any of the interviews. Mrs. Scott always came alone. She gave the data and information obtained in drawing the will. At first, she stated generally what she wanted to do; then when it came down to a division among the different parties in interest, she made a list of the names that she gave to witness and indicated what fractional interest each was to receive, and then from time to time she would keep changing these interests, substituting different fractions opposite different names. She was engaged in this way for two or three weeks. She would come to his office, perhaps twenty times in all, and suggest changes in the will. The witness formed the opinion she was sane, and judged so from her manner and appearance and her conversation and mode of doing business. He had no reason to suspect her sanity. Witness had no other business with decedent for some short space prior to the time she commenced talking about the will. She began to consult him on that subject more than a month before the date of the execution of the codicil, October 22, 1897. During that period that was the only transaction between them as attorney and client. She said she desired to give Mr. Scott expressly what she had given him in the will which was drawn

by the witness in 1891. She said that she was attached to his children and did not regard them as responsible for his shortcomings; that she was inclined to give them something which she had not done by the former will, and desired Mr. Galpin to so fix that Scott's share should be the same and that the amount to his children should be specified. She also said she was very apprehensive that the codicil would be broken and desired great pains taken.. She desired a will so drawn, if possible, that it could not be broken, and also she wanted great care taken that it should not be stolen, which she apprehended might happen. Decedent informed the witness that she was told that Mr. Estee and Mr. Ball would undertake to break this will. She was very anxious about the safety of the will and codicil and told the witness that she proposed to put it in her box in the Safe Deposit Building, and consulted him as to how she could do that and prevent some person obtaining access to the box and purloining the paper after her death. The codicil was drawn in duplicate, at his suggestion, to anticipate its possible loss. One copy was attached to the original will of 1891 and the other copy was retained by him for a while and kept in his safe and then Mrs. Scott took it away. She was a very suspicious woman. She said she would put that will where she thought it would be safe. . She did not disclose the place where she was going to put it. Subsequently it was returned to him and is now in his possession. The witness had no recollection of Mrs. Scott's saying anything about community or separate property, but she did say that a large part of her property was derived from her first husband, Salvin P. Collins, and she thought that it was but right that she should remember his relatives in the will.

Edward H. Horton has been manager of the house of J. C. Johnson & Company on Market street for about fifteen years. J. C. Johnson has been dead for some months. The late Mrs. Angelia R. Scott used to call frequently there and the house had transactions with her in selling goods. After the death of Mr. Collins she used to come to obtain advice from Mr. Johnson about her business affairs, and in the last ten years Mr. Johnson was absent a good deal on account of

illness, so she consulted witness many times. She spoke to him about the will and she told him that Mr. Scott was continually nagging her about making a will and that sometimes Scott made her sick by this talk. Horton identified the signatures to the different instruments. One was that of his uncle, Jacob C. Johnson, and the other his own, and the other that of Mrs. Angelia R. Scott, subscribed to the instrument dated September 7,. 1891; also the same may be said of the paper dated February 25, 1892; likewise the same as to the third paper appended dated October 22, 1897, to which a third signature, P. G. Galpin, is subscribed. Decedent declared the first to be her will, and signed it and asked himself and Mr. Johnson to be witnesses and they signed in her presence. It was the same of the second and third papers. Horton's recollection is that one will was executed in duplicate, she saying that if one were lost the other would serve. Mrs. Scott told witness that Scott was worrying her to death about her will; that he was making her life a perfect hell on earth; that he said he could smash any will that she could make. She told him that Mr. Scott was always at her and annoying her about the making of a will and saying to her that she was "crazy as a bedbug." Witness advised her that she might have that settled by an examination by competent physicians and this was done afterward at the time of the execution of the third paper, October 22, 1897, in the office of Mr. Galpin, the attorney. After the examination she came into the room where the witnesses were in waiting and said that she was all right and that she was sane, and those present assented to that proposition with the remark that if she were not sane no one was. The witness gave it as his opinion that she was sane.

We come now to an important item of evidence in this case: The examination of the decedent by the doctors, which it appears was the result of suggestions emanating from Mr. Horton and Dr. Lane. Counsel for contestant comments on the singularity of this circumstance, and thinks its unusual character significant, and cites a case in Oregon in which a similar proceeding was regarded as an unusual precaution and itself importing a consciousness of the existence of the

very fact inquiry into which it was intended to foreclose, and that, as in Twine's case in Coke's Reports, it was like a clause in a deed that it was made honestly, truly, and bona fide, and would lead to a suspicion against the integrity of the instrument: Greenwood v. Cline, 7 Or. 28.

As against these dicta and in connection with the consideration of expert testimony in general, reference may be made to the opinion of Dr. Clouston, an eminent alienist, in his Clinical Lectures on Mental Diseases, in which he says, in regard to will-making, that the great trouble is that medical men are usually not consulted at the time of making the will, when the real capacity of the testator could be examined into, but are placed on the witness-stand after he is dead, with one-sided imperfect information, and with every motive on the side calling the experts to prevent their getting at all the facts. It is most important, says Dr. Clouston, that a skilled and experienced physician should be asked to examine into the testamentary capacity of such cases before the destination of great sums of money is irrevocably decided by a document that above all things needs soundness of judgment for its validity. It would be well were qualified physicians oftener called for this purpose.

In the Oregon case it may be noted that the will was not set aside upon the ground of insanity but upon that of undue influence, and in the case at bar there is no evidence of undue influence. The facts as to the certificate in this case were brought out first by the cross-examination of Dr. William Henry Mays, who was called as an expert by contestant, and whose ability is admitted and experience exceptional in mental diseases.

Dr. Mays was for two years the assistant physician for the insane asylum at Stockton and also for an equal period superintendent of that institution, and he is a graduate in medicine of the University of California. In his direct examination he said in answer to the hypothetical questions that he considered the person described insane, assuming hypothesis. About all the constituents of insanity were present in that question; fixed delusions as to various fictitious circumstances, thought by the person to be facts without any basis

for belief.    On cross-examination Dr. Mays said he knew the late Mrs. Scott; met her at Mr. Galpin's office on the occasion of the execution of the codicil.    His acquaintance with this case began in this way: He was called by Mrs. Scott herself to testify or to give a certificate as to her sanity at a particular moment.    He knew Mrs. Scott prior to that time. He called at her house once or twice before at her request. On the first occasion he had a conversation with her for three-quarters of an hour or perhaps a full hour and on the second occasion for perhaps an equal space.    The first time was about a week before the meeting at the lawyer's office and the second two or three days prior to that.    The purpose and object of these conversations was on her part to acquaint the witness with her and to enable him to form a judgment of her sanity.    She did not tell him that in so many words, but she exhibited her books and accounts and went over them with him to a certain extent to show apparently that she was a bright business woman.    He met her after those conversations in Mr. Galpin's office in conjunction with other medical gentlemen for the purpose of testifying to her mental condition at that time with the view of her making a codicil. That was the third time he met her.    The date is in the codicil but he did not remember the date.    The interview on that occasion took about one hour and a half.    There were present Mr. Galpin, Dr. Robertson and Dr. Gardner, of Napa, himself, and Mrs. Scott.    Mrs. Scott was left in the room with the witness and the other physicians for the greater part of an hour, perhaps, hardly as long as three hours; it may have been two hours.    The three physicians were there to investigate into her mental condition at that time prior to her signing a codicil to her will, it being her wish that her sanity be established by these examining physicians.    She announced that as her object, saying she was apprehensive of the will being attacked after her death on the ground of her insanity.    They conversed with her with a view of ascertaining her mental condition; talked with her about her husband and about her relations with him; talked about a Mrs. Meily.    The doctors referred to all these matters; they made as thorough an examination as was possible then and

there with no counter-evidence. The physicians were called by Mrs. Scott and after the examination they signed a certificate of the result in answer to a request in writing, which request and certificate are as follows:

"To Drs. Gardner, Robertson, and Mays:

"Gentlemen: Having been informed that the husband of Mrs. Angelia R. Scott proposes to break any Will that Mrs. Scott may make, and being desirous to perpetuate evidence as to her mental condition at the time of executing the Codicil to her Will this 22nd day of October, 1897, I would be pleased to know what her mental condition is.

"October 22nd, 1897.

"PHILIP G. GALPIN."

"San Francisco, October 22nd, 1897.

"In compliance with the above request, we have this day carefully examined into the mental condition of Mrs. Angelia R. Scott, and in our opinion she is of perfectly sound and disposing mind.

"W. H. MAYS, M. D.
"J. W. ROBERTSON, M. D.
"A. M. GARDNER, M. D."

Another paper was written and signed by the witness and delivered to Mrs. Scott through the mail on the day of its date, October 22, 1897, and reads as follows:

"San Francisco, October 22nd, 1897.

"I have this day in compliance and in company with Dr. Gardner and Dr. Robertson, at the office of Attorney Galpin, made a careful examination of Mrs. A. R. Scott, with regard to her mental condition. I find her of sound mind and in full possession of her mental faculties. I also conversed with her at her home. I also conversed with her at some length some two or three weeks ago at her residence with the same end in view. On each of these occasions I made a special endeavor to get some evidence of mental impairment, but without success. On the contrary, she impressed me as a person of more than ordinary mental keenness and unusual power of memory."

Another paper introduced reads as follows:

"1118 Sutter Street, San Francisco, October 22nd, 1897.—
Mrs. A. R. Scott to Dr. Mays, for professional services, ex-
amination, consultation, and certificate of mental condition.

"$100.

"Paid, W. H. Mays."

Witness said that that was his bill, signature, and receipt
for the services specified. Dr. Mays thought that the first
conversation he had about her mental condition after her
death was with Mr. Galpin and Dr. Robertson. He told Dr.
Robertson how he had seen Mrs. Scott after making that
certificate and found that she had fooled them, and that she
had been playing a part, and how he had seen her since and
found undoubted evidence of insanity of the most atrocious
character, and that he must go to Mr. Galpin to explain mat-
ters. He went to Mr. Galpin and told him that he had seen
Mrs. Scott since and found her undoubtedly insane, and that
would very much modify his previous statement of her men-
tal condition made October 22, 1897. The witness did not
say at that conversation and in the presence of Mr. Galpin
to him or to Dr. Robertson, or at any time before, that he
had a talk already with Mr. Estee on the subject. Witness
did not know how long Mrs. Scott had been dead at the
time now alluded to. It was some little time after, perhaps
very soon after, may have been a month after that event.
The doctor changed his mind about the mental condition of
the lady about two weeks subsequent to the giving of that
certificate. He saw her two weeks after that and found her
insane. He did not go then and inform Mr. Galpin. He
first told him some little time after she died, about two or
three weeks after that event. Witness thought she died De-
cember 14, 1897. He talked with Dr. Robertson and told
him how he had found undoubted evidence of insanity, and
they talked the matter over about the way she had played
her part, and then he proposed going to see Mr. Galpin, say-
ing to Dr. Robertson, "We must not leave the matter in this
condition," and they went down there and witness related
the circumstance to Mr. Galpin. The witness had thought

over this matter a good deal; had been in consultation with Dr. Rucker, Dr. Hatch, and Mr. Estee. They all took a hand in framing the hypothetical question.

Dr. John W. Robertson is a physician and surgeon, graduate of the University of California medical department, proprietor of the sanitarium at Livermore, and formerly connected with the public hospitals for the insane, having had large and diversified experience in cases of insanity. Knew the late Mrs. Angelia R. Scott and at her request made an examination of her sanity. With the other physicians, they attempted to test her intellect, her memory, her ability to make a will. In speaking of Mr. Scott she began with a discussion of his first marriage—she was speaking with reference to her own—she said that Mr. Scott was not a good business man, that he had been married previously and had almost ruined the fortune that he had gotten of his first wife; that he had charge of her business affairs and that he had managed them very poorly; that it was only the untimely death of his first wife that saved anything at all to his children; that when she herself married she had been anxious to place her business affairs in the hands of Mr. Scott, but she soon found that it would meet the fate of his first wife's fortune; that when he went to New York he conducted all the business affairs in his own way; that his bank account grew very large, while her account decreased; that Mr. Scott had no money at all when he married her; that he had then in a little while thereafter several thousand dollars in bank; that in the course of time she found it absolutely necessary for her protection that she take her business affairs away from him; that she had been a kind mother to his children, that she loved them and desired to do something for them, and that, therefore, she wanted to make a will, a codicil to the will which would increase their share of the estate; she said that she did not particularly hate Mr. Scott, she disliked him on business grounds; that he had been unfaithful to her, that he had been unkind to her; that he had done everything to her that a husband should not do; that she did not intend to take away the part that she had given Mr. Scott and that while he had fallen in her estimation the children had risen

very much; she spoke of her relation with the children, of how well they were doing in the University, of what hope she had for their future; and that she had been instrumental in helping them along and desired that a part of her fortune should go to them; she again spoke of her sister in law, Mrs. Paisley, the sister of her deceased first husband, and at this time the witness again questioned her and she again said she did not believe that there had been any carnal intercourse between the two, but she felt that Mrs. Paisley had undoubtedly taken Scott's part and that he had made certain overtures to that lady and that she ought to have resented them more strongly than she had; she felt that they were nearer together than further away after those advances and overtures; that as Mrs. Paisley stayed along in the house she seemed to take Scott's part rather than hers and on that account Mrs. Scott made her go back home; and she did not care to leave any of her property to her. Mrs. Scott asked the witness if there was any insane delusion in that. He answered that he could discern no delusion in that disposition. Then the Meily question came up again. She again went fully into all the reasons for her suspicions there. She spoke of the thin partition and of the fact that when she went there she heard a noise of creaking of the bed—she heard it squeak and she heard voices after she had knocked and the noise kept up. She stood there awaiting the cessation of the noise and she heard a man's step going out to the kitchen and down a back way into the street. A little while later the door was opened and she went in. She found that the bedclothes had been rumpled; she believed that it was her husband. She asked the witness if this was an insane delusion provided all those were facts, and the doctor answered that all she needed for a basis was a fair suspicion. She claimed that certain persons had been to her and told her that Scott had visited Mrs. Meily on the afternoon in question; and she argued this point that it was not absolutely essential for her to have seen this with her own eyes but simply to have such evidence as would fairly warrant a suspicion. She asked the witness if there was any such evidence, if she could prove to him that she heard those noises while she stood there and

heard a man's step going away, and it was also shown that her husband had visited Mrs. Meily that afternoon, would he regard it as an insane delusion? The witness answered, "Certainly not," but that it would be a matter for legal investigation and he could not go into all these facts. She spoke with reference to her husband—she felt, she said, that in place of taking away from him she was adding to his share. The three points asked of her were the three changes made in the will: 1. With reference to Scott; 2. Mrs. Meily; 3. Mrs. Paisley. The physicians went over the point as to Mrs. Paisley time and again for the three hours they discussed the matter, and the witness finally came to the conclusion that no amount of discussion would enlighten him further. So he concluded to write another letter practically the same as this. In that other letter he said nothing about insane delusions. The witness identified a letter shown to him as the second letter dated October 22, 1897, entirely written, dated and signed by his hand; it must have been written about that date; it was written on the night he got home while everything was fresh in his memory; that is, the first letter was so dated and written; the second letter was written about three weeks afterward, and was a copy substantially of the first with certain matter eliminated, to which she took exception, and is as follows:

"October 22nd, 1897.

"Mrs. Angelia R. Scott,

"My dear Madam: By your request, I have made a thorough examination of your mental condition with reference to your capacity for drawing or altering your Will and signed a paper certifying your competency, and I now more explicitly state my reasons for so doing. I have carefully read your Will made several years ago, and thoroughly investigated your reasons for the changes made. I find you usually intelligent, rational and possessing excellent memory and able to sustain continuously a line of thought and saw nothing either in demeanor, method of expression, or mental peculiarity to in any way suspect mental weakness. I judge you to be a most remarkable business woman and unusually free from intuitively conceived reasoning, clear-headed, broad-

minded, and just. The best proof of which I judge to be
the Will you propose.

"(Signed)    Respectfully,

"J. W. ROBERTSON."

The doctor's reasons for leaving out of this letter the por-
tion she objected to in the former were: After the first in-
terview the only suspicion in his mind was the possibility of
insane jealousy, but that was only a possibility and a matter
that he could not determine. After these conversations he
still had no more reasons to omit what he did omit than he
had at the first letter. He did so simply because of a per-
sonal request and because of the fact that as he saw more
and more of her he became more and more fully convinced
of her mental soundness and naturally did not care to put
a stigma where he saw no valid reason for so doing. He be-
came as satisfied as he could possibly be of her soundness.
He had no mental reservation in his judgment of her sanity.
He knew nothing of Mrs. Meily or whether Mrs. Scott had
made those visits, but the statements of Mrs. Scott were plaus-
ibly put and well thought out, and whether the premises
were false or true the syllogism was perfect, reasons excel-
lent and explicit, and he could perceive no reason for a base
fabrication. What he omitted in her second letter was simply
a matter of courtesy to her; but he reserved his letter, placed
it on file, and desired to use it. In the conversations with
her she said that Mr. Scott said that she was insane and that
he would break any will that she made. She was for that
reason very anxious for the medical gentlemen to pass on
that proposition. She exposed her mind fully to them and
promised to answer as they should propound to her without
reserve, evasion, or equivocation, and she certainly did so
and gave them every opportunity of determining the ques-
tion presented. After a full and thorough examination Dr.
Robertson came to a positive conclusion that at the time he
observed her she was sane. He did not suspect even mental
weakness in her case. In his first letter there occurs this ex-
pression: "The only question that could arise was, whether
or not this judgment of yours was based on a delusion; as
this was the only question that could be raised as to your

sanity." That was omitted from the second letter simply because after his various conversations with her he saw no reason to entertain the slightest suspicion of any mental weakness. Her reasoning was logical, her statements plausible and possible. Regarding her sister in law, Mrs. Paisley, she made no charges whatever of immorality. With regard to Mrs. Meily it was impossible for him to test its truth; he had to accept the statements of Mrs. Scott as bases of belief. She argued the whole matter over with them. In regard to the hypothetical questions presented by the respective counsel, the answer is always based upon the assumptions of the premises.

Counsel for contestant comments upon the testimony of Dr. Robertson, saying that so far from contradicting or varying from the revised opinion or ultimate judgment of Dr. Mays, Robertson agrees with it in every essential particular, and if he had seen what Dr. Mays saw in his last observation or visit to Mrs. Scott, he would not have subscribed to her sanity, and counsel says that so far from Dr. Mays' conduct being censurable, it is highly to be commended as the act of a conscientious and dignified gentleman and reputable physician, for when he found that he had been deceived by her in the "most atrocious" manner and discovered the deception, he did his duty and corrected his original opinion and gave his evidence as he was bound in honor and conscience to do. When upon that visit to Mrs. Scott's house she pointed out through the window to an imaginary object standing outside near the barndoor, when there was no one there, and "the whole was the inveterate phantom of a morbid imagination," he became convinced that she was the victim of an insane delusion: Dew v. Clark, 3 Add. 79, reprinted in Eng. Ecc. Rep. 436.

This cited case is entitled to attentive perusal for its bearing on the facts here adduced in evidence on the issue of insane delusion; the elaborate treatment of the topic and the minute and thorough examination of the phenomena of mental perversion occurring in that case with the reasoning leading to the conclusion reached by Sir John Nicholl, the trial judge, are pertinent and instructive.

The court has read this opinion with renewed interest, having previously examined it with care, and indorses the encomium of counsel as to the ability with which the author treated the issues and evidence.

Counsel for contestant says, further, that the examination in Mr. Galpin's office shows a lack of thoroughness. It was not comprehensive nor profound—so superficial that it was easy for Mrs. Scott to conceal the point upon which she was really daft. She carefully avoided allowing them to approach some of her most salient symptoms of insanity. This is one of the features of persons possessed of delusions, to throw the searcher off the scent; but when the insane person is off guard, the delusion is detected. This is how Dr. Mays came to change his opinion, and his reason for believing that he had been deceived by this designing woman in the first instance is satisfactory; but when he saw the clear manifestation of her mania as she pointed out the window of her residence and professed to see persons on the outside when no one was in the direction indicated, he became convinced that he was dealing with a person whose mind was infected by an insane delusion. Counsel contends that Dr. Mays was right in his final opinion, but erred egregiously in his certified conclusion, although he accounts satisfactorily for the cause of the original error, and he acted in a professional manner in seeking on the stand to correct the mistake into which he had been led by the cunning characteristic of this species of insanity.

While the court does not choose to adopt the severe strictures applied by proponents to the conduct of Dr. Mays, as there is no necessity of ascribing his alteration of attitude to a corrupt motive, yet it cannot acquiesce in the views of counsel for contestant, so speciously presented, that there was a lack of thoroughness in the examination of the decedent in Mr. Galpin's office and that it was neither comprehensive nor profound. Dr. Mays himself testifies that the examination was thorough and occupied hours, and his testimony throughout shows, including the certificate and his own letter, that his first judgment was better based than his second, founded as the latter was upon a casual incident

scarcely sufficient to operate so extensive an inference. The inadequacy of his grounds for modifying his judgment, as compared with the predicate of his first opinion, seems to the court plain, taken in connection with his delay in communicating his change of conviction until after the death of testatrix. As the court reads the record there is no satisfactory explanation for not divulging his discovery before the death of Mrs. Scott.

The testimony of Dr. Robertson is certainly strong and clear and without any vein of vacillation or symptom of partisan bias, and he came to a positive conclusion, as he himself says, "after a full and thorough examination," that she was sane, in the fullest sense of that word, and he adhered to this opinion after a most searching cross-examination. Dr. Robertson is a friend of Dr. Mays and a weekly visitor to the latter's office in this city, which seems to be his local headquarters and the place where he received word to call and see Mrs. Scott, and whence he went, with the result that she took him to task for the form of his letter which he recast, leaving out the portion to which she took exception hereinbefore quoted. Notwithstanding this intimacy of relation and closeness of communication between these two doctors, Dr. Robertson has never altered his certified conviction in favor of the sanity of testatrix, and, on the whole, the court considers his conclusion correct.

It appears, as a reason for the omission to call the third signer of the certificate, Dr. Gardner, that he was absent from the city at the time of the trial when his presence was sought.

As to the utility of an inquisition into the testamentary capacity of a person prior to decease, undoubtedly an impression exists that it is a wise precaution, and in this case it has proved useful as tending to establish the fact that decedent was certainly not a victim of an insane delusion with respect to the designs of her husband, who has verified her apprehensions in his attempt to set aside this will. That there is an impression current that such an ante-mortem examination would be a salutary provision of the law has been shown in a bill introduced in the legislature of this state to admit wills

to probate prior to the death of testator, which measure, however good in principle, was impracticable in details and was not passed: Assembly Bill, No. 199, introduced in January, 1895.

The will may be considered in proof of its own validity and of the sanity of its maker. A careful reading of the entire instrument will justify the opinion rendered by Dr. Robertson that it was the product of a clear-headed person, and that the best proof of her clearness of mind is in the instrument itself. She may have been mistaken in her premises and violent in her prejudices, but strong, violent and unjust prejudices do not show mental incapacity: Trumbull v. Gibbons, 22 N. J. L. 117.

Her antipathy to Scott was not deep-seated, and was by her rationally explained. If she were the victim of an insane delusion in 1897 she would have taken away the part that she had given him in 1891; but so far from doing that she really added to it, as she herself said, because although he had abated in her affection, her regard for the children had risen. So far as the will of November 7, 1891, is concerned it can hardly be pretended that there is sufficient evidence to prove that at that time testatrix was not competent. The only witnesses who testified that in their opinion she was insane in 1891, were Hammond, Mortier, Perkins, Dyer, Uhlhorn and Mrs. O'Connor. It cannot be claimed that the testimony of the experts was in any manner applicable to the original will which was executed in that year. The court has already commented sufficiently upon the testimony of the witnesses named. By that will testatrix makes legacies of a few thousand dollars and the residuary interest in the estate. She gives thirty-three two-hundredths or about one-sixth to relatives of her former husband, Mr. Collins, and the remaining one hundred and sixty-seven two-hundredths to her relatives, less two-fiftieths to Mr. Scott.

By the second will she gives twelve-fiftieths or about one-fourth to relatives of Collins and of the remaining thirty-eight-fiftieths she gives thirty-three-fiftieths to her own kin, and to Scott the same as in the first will and to his sons and daughter one-fiftieth and one-fiftieth to charity. The

extraordinary care to do what was right all around and the soundness of her reasons for discriminations are shown in the evidence of Mr. Galpin, whose office she visited a score of times and who visited her house several times for consultation, until he was quite worn with the work of arranging the data and information which she gave and in readjusting the particulars until she was finally satisfied with the disposition. Her idea of equity was exhibited in remembering the relatives of her deceased husband. The power and tenacity of her memory were manifested in carrying all the various intricacies and details in her mind. Her understanding of her relation to objects of bounty and the natural and moral rights of others was shown by the evidence of Dr. Lane in regard to what she said about charities when he besought her out of her abundance to give to some benevolent institution and she replied that she had enough of poor relations for that purpose, and bestowed her benefactions accordingly. Her reasons for curtailing the expectancy of Scott have been dealt with sufficiently. Scott was not the natural object of her bounty, yet she did not discard him nor make any change in her two wills to his disadvantage, but, on the contrary, rather increased his proportion by the share she gave to his children, and in this regard it is a circumstance tending to show that she was not as black as she has been painted—that one of the reasons for changing her testament proceeded from her kindness of heart toward these children, and that while the boys were inmates of her household, which was from the moment of their father's marriage to her, they had met with affectionate treatment at her hands. The amount paid for board is a comparative bagatelle. The books show that notwithstanding that the two boys made their home at this house, and that Scott had an allowance of $2,400 per annum from the estate of his wife to support them, that in 1891 he paid on account of board, $25. In 1892 and 1893 he paid nothing. In 1894, he paid $339. In 1895, he paid $200,—making a total of $564 paid into this house for the board of these two boys for a period of six years, a little less than $78 per year, these boys having in their own right, as they

testified, from fifty to seventy-five thousand dollars, which they received from their mother and from some relatives.

If she were a mean woman, a miser, or a heartless step-mother, she would not have allowed the children to remain in such circumstances, and if she was so base as is said, the father and guardian disregarded his duty in allowing the children to stay in an establishment which one of his witnesses testified she thought on the first day she went there was a fast house.

Testatrix was not forgetful of Mr. Scott's children although they had an ample fortune of their own, and notwithstanding the alleged delusions, and all the reasons that would have prompted to cut off Mr. Scott, she accords him substantial recognition.

If there were causes sufficient to have induced a sane woman to ignore him in her will or reduce what otherwise would have been a just allowance, the fact that she entertained an unjust or an unfounded suspicion, in regard to his treatment of her, or unjust prejudice against him, would not affect the will nor demonstrate that she was necessarily of unsound mind: Clapp v. Fullerton, 34 N. Y. 196, 197, 90 Am. Dec. 681; Coit v. Patchen, 77 N. Y. 537, 538.

The tests of testamentary capacity are: 1. Understanding of what testatrix is doing; 2. How she is doing it; 3. Knowledge of her property; 4. How she wishes to dispose of it; 5. Who are entitled to her bounty: Clark v. Ellis, 9 Or. 147.

Applying these tests to the facts of this case there can be no doubt of the result.

In Daniel v. Daniel, 39 Pa. 191, it is said that testamentary capacity implies that the testator fully understands what he is doing, and how he is doing it; he must know his property and how he wishes to dispose of it among those entitled to his bounty. If he understands in detail what he is doing, and chooses with understanding and reason between one disposition and another, it is sufficient.

In Horne v. Horne, 9 Ired. 99, with reference to the amount of testamentary capacity necessary, it is said it is sufficient if the testator knew what he was doing, and to whom he was giving his property; and in 1 Redfield on Wills, 125, 127, it

is said that this is about as accurate and brief a definition as can be given.

In Kinne v. Kinne, 9 Conn. 104, 21 Am. Dec. 732, the court say: "Had he an understanding of the nature of the business he was engaged in, a recollection of the property he meant to dispose of, and of the persons to whom he meant to convey it, and of the manner he meant to distribute it between them?"

In Stevens v. Vancleava, 4 Wash. C. C. 262, Fed. Cas. No. 13,412, Washington, J., said: "To sum up the whole in the most simple and intelligent form, were his mind and memory sufficiently sound to enable him to know and to understand the business in which he was engaged at the time he executed the will?"

The point of time, then, to be considered at which the capacity of the testatrix is to be tested, is the time when the will was executed. This is the important epoch. Judge Washington says: "The evidence of the attesting witnesses and next to them, of those who were present at the execution, all other things being equal, are most to be relied upon."

In this case the attesting witnesses were present at the execution, and the two who survive have testified to the soundness of her mind at that time. The evidence of the attorney who drew the will according to her instructions, and who was a witness to the last codicil, and the positive and uncontradicted testimony of the subscribing witness to all the instruments, of the soundness of the testator's mind at the time the will was executed, in addition to the other witnesses whose evidence has been examined and reviewed, establish beyond doubt that the testatrix was rational, and did know and understand what she was doing at that time. As was said in the case of Lee's Heirs v. Lee's Executors, supra. "There was so much deliberation and thought in all this, that even if the testatrix had been before afflicted with habitual insanity, yet this conduct was sufficient to establish a complete intermission."

The prayer of the contestant's petition is denied and judgment ordered for proponents.

The Principal Case has been before the appellate courts in 124 Cal. 671, 57 Pac. 654; 128 Cal. 57, 60 Pac. 527; 1 Cal. App. 740, 83 Pac. 85; 77 Pac. 446.